2015 IL App (1st) 120958

FOURTH DIVISION
June 25, 2015

No. 1-12-0958

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 09 C 660659 |
| | ) | |
| MARLON MINTER, | ) | Honorable |
| | ) | Luciano Panici, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE ELLIS delivered the judgment of the court, with opinion.[*]
Presiding Justice Fitzgerald Smith concurred in the judgment and opinion.
Justice Cobbs dissented, with opinion.

**OPINION**

¶ 1    After a jury trial, defendant Marlon Minter was convicted of armed robbery and sentenced to 23 years' incarceration. Defendant, who was 16 years old at the time of the offense, was automatically tried as an adult pursuant to the Juvenile Court Act of 1987 because the charges alleged that he was armed with a firearm during the robbery. 735 ILCS 405/5-130(1)(a)(iv) (West 2008).

¶ 2    At his trial, defendant did not deny committing the robbery. The sole issue in contention was whether defendant's accomplice, a man known as "Breed," was armed at the time of the robbery, which, under the law of accountability, would make defendant liable for the firearm as well. According to the victim, Markel Williams, and defendant's incriminating statements to the police, Breed was armed. Defendant's theory, supported by his own testimony, was that Breed was unarmed.

_____

[*] This case was recently reassigned to Justice Ellis.

¶ 3     On appeal, defendant raises six issues. Three of those issues relate to alleged errors in defendant's trial proceedings, while the other three relate to defendant's sentence. For purposes of clarity, we first outline defendant's contentions of trial error, then outline his three challenges to his sentence.

¶ 4     Defendant first contends that the trial court violated his right to present a defense by preventing him from challenging his incriminating statement and from impeaching the State's only eyewitness. For reasons explained more fully below, we conclude that defendant was not deprived of his right to present a defense. While several of the trial court's rulings were incorrect, those errors did not significantly impact defendant's ability to challenge the State's evidence or present his case.

¶ 5     Defendant's second contention of trial error relates to evidence of his tattoos that was presented at trial. Defendant claims that the trial court's rulings regarding his tattoos deprived him of a fair trial because they created the possibility that the jury would view him negatively because of his tattoos. We disagree that the rulings regarding defendant's tattoos prejudiced defendant's right to a fair trial because defendant presented the only evidence regarding the meaning of his tattoos, and he provided an innocuous explanation for each one. Moreover, the State's cross-examination regarding the tattoos did not uncover any prejudicial images or testimony.

¶ 6     Defendant's third contention of trial error is that the trial court's improper comments and bias deprived him of his right to a fair trial. We conclude that a majority of the allegedly objectionable comments by the trial court were not improper; they were responses to defense counsel's repetitive questioning. Although we agree that the trial court's comments and rulings during closing argument were improper, defendant forfeited review of those errors because he did not raise his objection to those actions in his posttrial motion. We reject defendant's arguments that

we should relax the forfeiture rule under *People v. Sprinkle*, 27 Ill. 2d 398 (1963), and we disagree that the improper comments constituted plain error.

¶ 7 Along with defendant's three assertions of trial error, defendant also raises three challenges to his 23-year sentence. First, defendant asserts that the automatic transfer provision of the Juvenile Court Act of 1987 (705 ILCS 405/5-130(1)(a) (West 2008)), which required that he be prosecuted as an adult, violated his right to due process of law, the Eighth Amendment of the United States Constitution (U.S. Const. amend. VIII), and the Proportionate Penalties Clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11). Second, defendant asserts that the 15-year firearm enhancement to his sentence was void because it had been ruled unconstitutional at the time of the offense. Finally, he asserts that the trial court improperly considered the two pending criminal charges against him as aggravating factors increasing his sentence.

¶ 8 We must reject defendant's constitutional and voidness challenges because the Illinois Supreme Court recently issued decisions rejecting identical arguments. *People v. Patterson*, 2014 IL 115102; *People v. Blair*, 2013 IL 114122. However, we agree that the trial court erred in considering defendant's pending charges in aggravation. We affirm defendant's conviction, vacate defendant's sentence, and remand for resentencing.

¶ 9                                I. BACKGROUND

¶ 10                    A. Trial Testimony And Evidentiary Rulings

¶ 11 Both Williams and defendant testified that, on March 24, 2009, defendant and Breed approached Williams as he was walking home from school. Williams testified that Breed pointed a gun at his chest while defendant took Williams's cell phone, driver's license, credit card, and cash from his pockets. Defendant testified that neither he nor Breed had a gun or brandished a gun. Defendant admitted to taking items from Williams's pockets, including his driver's license.

¶ 12    Both Williams and defendant testified that defendant told Williams he would "shoot ***
up" Williams's house if he called the police. After the robbery, Williams went home, told his
mother what happened, and called the police. Williams did not tell his mother that Breed had a gun
during the robbery.

¶ 13    During her cross-examination of Williams, defense counsel asked, "And when you told the
police officer that you were robbed at gunpoint, you thought that—you told the police officer that
because you thought that they would be more likely to catch the person?" Williams said, "No," and
the State then objected to the question, arguing that it "call[ed] for speculation by the police." The
trial court sustained the objection. Defense counsel then asked Williams, "Did you think the police
officer would look for the person if they didn't have a gun?" The State again objected, saying that
the question called for speculation. Defense counsel replied, "Judge, it goes to his state of mind."
The court sustained the objection and said, "Move on."

¶ 14    Defense counsel also questioned Williams regarding what he told Detective Manuel
Escalante at the Harvey police station. Williams denied telling Escalante that Breed pulled out the
gun after he had already gone through his pockets.

¶ 15    During her direct examination of defendant, defense counsel asked defendant about the
circumstances surrounding the statements he made to Detective Escalante and Assistant State's
Attorney (ASA) Desiree Berg. Defendant said that, when he spoke to Escalante and Berg, he
admitted to taking Williams's property but said that there was no gun involved. Defense counsel
then asked whether Escalante threatened defendant:

      "Q. [Defense counsel:] Now, while you were there speaking with Detective

    Escalante, did he make any threats to you at all?

      A. [Defendant:] Yes ma'am.

Q. And what were those?

A. He was telling me to – actually, you know, to say that I did it and that there was a gun involved or he was going to put other robberies that was [*sic*] occurring around Harvey, Illinois, on me.

He was showing me pictures, asking me was this me. And I wasn't never [*sic*] there at the time. I didn't know nothing [*sic*] about it.

Q. So Detective Escalante wanted you to say that there was a gun involved?

A. Yes, ma'am.

MR. VOLKMAN [Assistant State's Attorney]: Judge, we are going to object to this line of questioning. It is hearsay.

THE COURT: Sustained."

The parties then held a sidebar, where defense counsel argued that Detective Escalante's statements were not being used to prove the truth of the matter asserted in those statements. The court sustained the State's hearsay objection and instructed counsel to "[m]ove on."

¶ 16    Defendant also testified that he told ASA Berg twice that Breed was not armed, but Berg told him that there "had to be a gun involved because [he] wouldn't be *** charged with armed robbery" if there was not. The State objected to this testimony and the court sustained that objection. The court instructed the jury to disregard that testimony.

¶ 17    Later, defense counsel asked defendant why he would sign a written statement saying that Breed was armed if it was not true. Defendant replied, "Because, like the reason I said earlier, I didn't want to get charged with any more charges that I had nothing to do with at all." The State did not object to that answer. During her redirect examination, defense counsel again asked defendant why he signed the portion of the statement saying that Breed was armed. Defendant again

responded, without objection from the State, "Because I didn't want to get charged with any more cases."

¶ 18    Detective Manuel Escalante of the Harvey police department testified that, on March 24, 2009, he spoke with Williams at the police station about the incident. The next day, Escalante saw defendant at the intersection of 145th Street and Halsted Street. As Escalante approached defendant, defendant ran. Escalante chased defendant down and arrested him.

¶ 19    At the police station, Escalante searched defendant and found cannabis and Williams's driver's license. Escalante testified that defendant admitted to robbing Williams with Breed, who was armed with a gun. Escalante saw Assistant State's Attorney (ASA) Berg reduce defendant's statement to writing in the presence of defendant and his mother. Defendant's written statement was introduced as evidence. It said that Breed had a gun during the robbery.

¶ 20    On cross-examination, Escalante said that defendant told him Breed's real first name and that Breed lived on 146th Street in Harvey. According to Escalante, 146th Street ran east to west across Harvey. Escalante said that, if a gun had been involved, he would try to recover it. He acknowledged that the gun Breed allegedly used was never recovered, but he maintained that he searched for it.

¶ 21    After defendant finished testifying on the second day of trial, defense counsel noted that Detective Escalante was not available to testify regarding Williams's statements to him. Defense counsel said that Escalante was necessary to perfect her impeachment of Williams, as he would testify that Williams said that Breed went through his pockets, then pulled out the gun. This testimony would conflict with Williams's testimony at trial that Breed pulled out a gun first, then went through his pockets. The court asked whether Escalante had been served with a subpoena. The State said that it had attempted service, but that Escalante had gone on medical leave. The

court asked defense counsel, "What do you want to do today?" Defense counsel moved for a mistrial and the trial court denied that request. Defense counsel said that she did not "see how he could be" present for trial the day before if he was now on medical leave, but the court said, "He was released after he was done testifying. You should have foreseen that and you should have served him with the subpoena."

¶ 22                    B. Motion *In Limine* And Evidence Regarding Tattoos

¶ 23    Before trial, defendant made a motion *in limine* seeking permission to apply flesh-toned makeup to his face in order to cover tattoos he had received since his arrest. Defense counsel argued that, since defendant did not have the tattoos at the time of the offense, covering them up would not impede any witness's ability to identify him. Defense counsel also argued that the tattoos, especially defendant's teardrop tattoos, would be prejudicial because the jury could interpret them to be gang tattoos. The trial court denied defendant's request, noting that defendant chose to get the tattoos himself and that he should not be allowed to change his appearance. Defendant renewed this request in the middle of the trial, but the trial court again denied it.

¶ 24    During her direct examination, defense counsel asked defendant about his facial tattoos. He said that he had one tattoo over his right brow that said, "Ike," which was his younger brother's name. Defendant testified that the tattoo over his left eyebrow, which read, "A.T.G.," stood for "Achieving Through Goals." Defendant testified that the four teardrop tattoos on his face represented the deaths of his father, his twin brother, and his two older brothers. He said that he had a spider web tattooed on his face because he liked the image.

¶ 25    On cross-examination, the State asked defendant about the meaning of tattoos on his hands. He said that the one reading, "A.T.G.," meant the same thing as the similar tattoo on his face. He said that another tattoo reading, " 'Little Man' and 'Laundra,' " was for him and his girlfriend. The

State then asked defendant if he had tattoos on his arms. He said he did, and the State asked that defendant roll up his sleeves. Defense counsel objected and the court overruled the objection. Defense counsel requested a sidebar, and the court replied, "No, objection is overruled." Defense counsel again pressed for a sidebar and the court relented. During the sidebar, defense counsel argued that the prosecution was exceeding the scope of her direct examination, which focused solely on defendant's visible tattoos. The State responded that defense counsel had opened the door to questioning about defendant's tattoos. The court overruled defendant's objection.

¶ 26    After the sidebar concluded, the State instructed defendant to roll up his sleeves. Defendant noted a tattoo on one arm that said, "Little Man," which was his nickname. On his other arm, he had a tattoo that said, "Chief," and a tattoo of his mother's name. When the State asked what the "Chief" tattoo meant, defendant replied, "Chief, you don't know what 'chief' mean[s]?" The State did not ask any additional questions regarding defendant's tattoos.

¶ 27                    C. Jury Instructions, Closing Arguments, And Verdict

¶ 28    During the jury instructions conference, defense counsel proposed four modified versions of Illinois Pattern Jury Instructions, Criminal, No. 1.01 (4th ed. 2000), each of which specifically instructed the jury to not consider defendant's tattoos in reaching its verdict. The court denied the proposed instructions.

¶ 29    The State objected to the use of Illinois Pattern Jury Instructions, Criminal, No. 3.06-3.07 (4th ed. 2000) (hereinafter, IPI Criminal 4th No. 3.06-3.07), which pertains to the use of a defendant's prior statements as evidence. The State argued that, because defendant testified that he told Detective Escalante that there was no gun involved, defendant's statements that there was a gun were prior inconsistent statements. The State claimed that Pattern Jury Instructions, Criminal, No. 3.11 (4th ed. 2000) (hereinafter IPI Criminal 4th No. 3.11), which discusses prior inconsistent

statements of a witness, was more appropriate. Defense counsel argued that IPI Criminal 4th No. 3.06-3.07 was the correct instruction for defendant's incriminating statement, as the State used it as substantive evidence and defendant denied making a portion of the statement. The court found that IPI Criminal 4th No. 3.11 was "more on point" and rejected the use of IPI Criminal 4th No. 3.06-3.07.

¶ 30    During closing arguments, defense counsel argued that Detective Escalante may not have actually believed that a gun was involved in the robbery because he did not recover it despite knowing Breed's name and where he lived. The State objected to this argument and the trial court sustained that objection. The court said that defense counsel should not opine as to Escalante's beliefs. During the State's closing argument, the State asserted that defendant did not know about the law of accountability when he admitted that Breed was armed. The State claimed that, after consulting with his attorney and learning that he could be held accountable for Breed's being armed, defendant decided to testify that a gun was not involved. Defense counsel objected to this argument and the trial court overruled that objection, finding that the State drew a reasonable inference from the evidence.

¶ 31    After the parties made their closing arguments, the trial court instructed the jury. The court read part of IPI Criminal 4th No. 3.11:

"The believability of a witness may be challenged by evidence that on some former occasion he made a statement that was not consistent with his testimony in this case. Evidence of this kind ordinarily may be considered by you only for the limited purpose of deciding the weight to be given to the testimony you heard from the witness in this courtroom.

However, you may consider a witness's earlier inconsistent statement as evidence

without this limitation when the statement narrates, describes or explains an event or condition the witness has personal knowledge of. It is for you to determine whether the witness made the earlier statement and if so what weight should be given to that statement. In determining the weight to be given to an earlier statement, you should consider all of the circumstances under which it was made."

¶ 32    During the jury's deliberations, it sent out a note requesting to see "a portion of the transcript regarding Det. Escalante on gun search by defense [*sic*]." The court replied that the transcripts were not available and that the jury should continue deliberating. The jury eventually found defendant guilty of armed robbery.

¶ 33                          D. Posttrial Motions And Sentencing

¶ 34    Defendant filed a motion for a new trial, asserting that the trial court erred in restricting defendant's testimony that his confession was coerced and in precluding him from covering his facial tattoos. The trial court denied the motion.

¶ 35    At defendant's sentencing hearing, the State noted that defendant had two criminal charges pending against him, one for possession of contraband in a penal institution and one for aggravated battery of a correctional officer. In discussing the aggravating factors applicable to defendant, the trial court noted that defendant had two "new charges" and said that those charges "do[ ] not go well for him." The court also took note of defendant's juvenile adjudication for battery and the fact that he threatened to shoot Williams's house if he called the police. In mitigation, the court took note of defendant's youth and the fact that several of his family members had died. The trial court sentenced defendant to 23 years' incarceration. The minimum available sentence was 21 years: six years for the armed robbery, plus a mandatory 15-year enhancement because of the use of a firearm.

¶ 36    Defendant filed a motion to reconsider the sentence, which asserted that the trial court improperly considered his pending charges in aggravation. Defense counsel argued that the trial court conducted no inquiry into the facts underlying those charges and thus could not rely upon them in sentencing defendant. The court denied defendant's motion. Defendant appeals.

¶ 37                                II. ANALYSIS

¶ 38                      A. Defendant's Right To Present A Defense

¶ 39    Defendant first claims that four errors, both individually and cumulatively, denied him his constitutional right to present a defense:

        1. That the trial court incorrectly excluded, as hearsay, defendant's testimony that the police detective and Assistant State's Attorney who elicited his confession made coercive statements;

        2. That the trial court failed to give the jury the correct pattern instruction on his incriminating statement;

        3. That the trial court precluded him from cross-examining Williams on whether Williams thought the police would be more likely to investigate the robbery if they believed a gun was involved; and

        4. That the trial court failed to order a continuance so that defendant could subpoena the detective who interviewed Williams and perfect defendant's impeachment of Williams.

According to defendant, these errors prevented him from challenging his incriminating statement and from impeaching Williams. We address each of these alleged errors in turn.

¶ 40                      1. *Whether Police And Prosecution Comments Were Hearsay*

¶ 41    At trial, the court sustained the State's hearsay objections to defendant's testimony that Detective Escalante threatened to frame him for additional armed robberies if he did not confess. The court also sustained a hearsay objection to defendant's testimony that ASA Berg refused to accept his assertions that Breed did not have a gun. Defendant claims that these rulings were erroneous because the testimony was not being used to prove the truth of the matter asserted; it was used to prove the effect on defendant and provide a reason why he would falsely admit that Breed was armed. See *People v. Dunmore*, 389 Ill. App. 3d 1095, 1106 (2009) (statements used to prove effect on listener's mind are not hearsay). The State replies that defendant forfeited this issue by failing to raise it in the trial court, and that the testimony it objected to was hearsay.

¶ 42    To begin, we reject the State's forfeiture argument. Defense counsel sought to elicit the testimony from defendant and argued that it was not hearsay because it was not being used to prove the truth of the matter asserted. Defendant again raised these arguments in his motion for a new trial. That is all defendant was required to do to preserve this issue for our review. *People v. Denson*, 2014 IL 116231, ¶ 11.

¶ 43    The State contends that this was not enough, however, because, at trial, defense counsel did not articulate that the comments were being used to prove the effect on defendant's state of mind. The State is incorrect. Defense counsel argued that the evidence was not being used to prove the truth of the matter asserted. Defendant again argued that the statements were not hearsay in his posttrial motion. The trial court thus had ample opportunity to address the same challenge that defendant now raises. Defendant did not need to raise his argument in precisely the same way in order to preserve it on appeal. See, *e.g.*, *People v. Heider*, 231 Ill. 2d 1, 18 (2008) (finding that defendant did not forfeit issue where trial court had opportunity to address issue below and defendant did not raise "completely different objection" on appeal); *People v. Mohr*, 228 Ill. 2d 53,

64-65 (2008) (rejecting State's forfeiture argument because defendant did not need to object to jury instruction at issue "on identical grounds"; fact that defendant objected to instruction at trial and in posttrial motion was sufficient).

¶ 44 Turning to the substance of defendant's argument, it is clear that defendant intended to use these statements to explain why he told the police that Breed was armed, even though he testified at trial that Breed was not. The value of the alleged threats was that they tended to show why defendant would falsely confess. In other words, they were used to prove the *effect* on defendant. It was irrelevant whether or not the substance of those statements were true (*i.e.*, whether Escalante would actually frame defendant); it only mattered that defendant heard the threats and was affected by them. Consequently, they were not hearsay. See *People v. Theis*, 2011 IL App (2d) 091080, ¶¶ 31, 33, 40 (detective's statements during interrogation, which defendant asserted were coercive, were not hearsay because they were used to prove their effect on defendant).

¶ 45 Having determined that the trial court erred in excluding defendant's testimony, the State must establish that this error was harmless beyond a reasonable doubt. *People v. Mullins*, 242 Ill. 2d 1, 23 (2011) (State must show constitutional errors are harmless beyond reasonable doubt). In determining whether an error was harmless, we consider whether the error contributed to the conviction, whether the other evidence in the case overwhelmingly supported the conviction, and whether the improperly admitted evidence was cumulative or duplicative of the properly admitted evidence. *People v. Patterson*, 217 Ill. 2d 407, 428 (2005).

¶ 46 First, the evidence against defendant was overwhelming. The only issue at trial was whether Breed was armed during the robbery. Williams, whose testimony was not significantly impeached, testified that Breed was armed. Williams's testimony was corroborated by Detective Escalante, who said that defendant admitted that Breed was armed, as well as by defendant's

signed statement indicating that Breed was armed. While defendant argues that he would have been able to impeach Williams if he had an opportunity to secure Escalante's testimony after the first day of trial (see *infra* Part I.A.4), that impeachment was minor. Even if he had perfected defendant's impeachment, Escalante would have simply contradicted Williams's testimony as to when Breed pulled out the gun and whether both Breed and defendant, as opposed to just defendant, went through his pockets. Neither fact would have undermined the central point of Williams's testimony: that defendant and Breed robbed him at gunpoint. It is thus unlikely that these minor inconsistencies would lead the jury to reject both Williams's testimony and defendant's oral and written confessions.

¶ 47    Although defendant's trial testimony was not inherently implausible, it would not have significantly undermined the strength of the State's evidence, in any event. Defendant was significantly impeached by his prior oral and written statements, where he admitted that Breed had a gun. Even though defendant testified that those statements were coerced, his prior inconsistent statements still served to impeach his testimony that Breed was unarmed during the robbery. When contrasted with Williams's testimony, Escalante's testimony, and defendant's written statement, defendant's evidence was weak.

¶ 48    Moreover, the evidence at issue was cumulative because defendant was ultimately allowed to testify that his statement was coerced. After the trial court had incorrectly sustained the State's hearsay objections, defense counsel asked defendant why he would initial the written statement saying that Breed was armed if it was not true. Defendant replied, "Because, like the reason I said earlier, I didn't want to get charged with any more charges that I had nothing to do with at all." During her redirect examination, defense counsel again asked defendant why he signed the statement and defendant again responded, "Because I didn't want to get charged with any more

cases." The State did not object to either of these statements, nor did the court tell the jury to disregard them. Because defendant was ultimately able to testify that he was coerced into signing the statement, the improperly excluded testimony was cumulative. See *People v. Seesengood*, 266 Ill. App. 3d 351, 358-59 (1994) (erroneous exclusion of statements used to prove effect on defendant's mind was harmless where defendant "was allowed to testify to essentially the same matters" in other portions of his testimony). The trial court's error had minimal effect on defendant's ability to explain his inculpatory statements.

¶ 49                    2. *Jury Instructions On Defendant's Confession*

¶ 50    Defendant also argues that the trial court erred in giving IPI Criminal 4th No. 3.11 in lieu of IPI Criminal 4th No. 3.06-3.07. He contends that IPI Criminal 4th No. 3.06-3.07 is necessary where, as in this case, the State uses a defendant's incriminating statement as evidence against him, and the defendant denies making a part of that statement. The State contends that this issue is forfeited, and that defendant suffered no prejudice from the exclusion of IPI Criminal 4th No. 3.06-3.07 in any event, because the other jury instructions adequately informed the jury of the legal principles contained in that instruction.

¶ 51    We first address the State's forfeiture argument. As the State points out, defendant did not include this issue in his posttrial motion. In order to preserve a challenge to jury instructions, a defendant must object to the instruction or offer an alternative at trial, as well as raise the issue in a posttrial motion. *People v. Hudson*, 228 Ill. 2d 181, 190 (2008). Because defendant did not complete that final step, he has forfeited review of this issue.

¶ 52    Defendant acknowledges that he did not include this issue in his posttrial motion but argues that he was not required to do so to preserve this issue. Defendant cites *People v. Haar*, 75 Ill. App. 3d 770 (1979), and *People v. Harris*, 72 Ill. 2d 16 (1978), in support of this proposition. In *Haar*,

the court held that the defendant did not forfeit his challenge to an erroneous jury instruction by failing to include it in his posttrial motion. *Haar*, 75 Ill. App. 3d at 773. The court relied on *Harris* in reaching this conclusion. *Id.* In his dissent in *Haar*, Justice Jones argued that *Harris* did not offer support for the majority's forfeiture discussion. *Id.* at 774 (Jones, J., dissenting).

¶ 53    As Justice Jones accurately recognized in *Haar*, the Illinois Supreme Court in *Harris* did not hold that a defendant asserting an instructional error is exempt from including that issue in his posttrial motion. In *Harris*, the State argued that the defendant had forfeited review of an error in his jury instructions because he did not include it in his posttrial motion. *Harris*, 72 Ill. 2d at 28. The court, citing Illinois Supreme Court Rules 615(a) and 451(c), noted that "[p]lain errors" and "substantial defects" in jury instructions could be reviewed notwithstanding defendant's forfeiture of the issue. (Internal quotation marks omitted.) *Id.* The court in *Harris* did not hold that the defendant could fail to include an issue in his posttrial motion and escape forfeiture; rather, the court held that, despite the defendant's forfeiture, the instructional error at issue could be considered to determine whether it rose to the level of plain error. *Id.*

¶ 54    With that understanding of *Harris*, we find that *Haar* lacks precedential support and we decline to follow it. The Illinois Supreme Court has been steadfast in its application of forfeiture in criminal cases: a defendant must raise an objection at trial or in a motion *in limine and* include the issue in a posttrial motion. *Denson*, 2014 IL 116231, ¶ 11; *Hudson*, 228 Ill. 2d at 190. Therefore, we adhere to the Illinois Supreme Court's oft-stated rule of forfeiture and find that defendant forfeited this issue on appeal by failing to include it in his posttrial motion.

¶ 55    Defendant argues that, regardless of his forfeiture, the omission of IPI Criminal 4th No. 3.06-3.07 was plain error.[1] The first step in determining whether an error is plain error is to determine whether an error occurred at all. *People v. Sargent*, 239 Ill. 2d 166, 189 (2010). We apply *de novo* review to the question of whether the jury instructions accurately conveyed the law. *People v. Parker*, 223 Ill. 2d 494, 501 (2006).

¶ 56    In this case, the trial court did not deliver IPI Criminal 4th No. 3.06-3.07 in relation to defendant's incriminating statements. Instead, the court gave IPI Criminal 4th No. 3.11, finding that it was applicable because defendant's prior statements conflicted with his trial testimony. This was error. IPI Criminal 4th No. 3.06-3.07, entitled, "Statements By Defendant," pertains to a defendant's statements, including admissions, confessions, or false exculpatory statements. IPI Criminal 4th No. 3.06-3.07; *People v. Batinich*, 196 Ill. App. 3d 1078, 1086 (1990). By contrast, IPI Criminal 4th No. 3.11 deals with prior inconsistent statements of any witness, not just a defendant, both when they are used for impeachment and as substantive evidence. IPI Criminal 4th No. 3.11; *Batinich*, 196 Ill. App. 3d at 1086. Here, the State introduced defendant's confessions as substantive evidence. Therefore, the trial court should have given the jury IPI Criminal 4th No. 3.06-3.07.

¶ 57    However, the trial court's failure to give that instruction was not plain error. Plain error occurs in two scenarios: (1) where the evidence at trial was closely balanced, so that the error threatened to tip the outcome in the favor of the State; and (2) where the error was so serious that it affected the fairness of the defendant's trial and the error threatened the integrity of the judicial

---

[1] The State contends that defendant also forfeited plain-error review by not raising it in his opening brief. The State is incorrect. It is well established that plain error may be raised for the first time in a reply brief, as defendant did. *People v. Ramsey*, 239 Ill. 2d 342, 412 (2010) (citing *People v. Williams*, 193 Ill. 2d 306, 347-48 (2000)).

process. *People v. Thompson*, 238 Ill. 2d 598, 613 (2010). In the context of an error relating to jury instructions, the Illinois Supreme Court has enumerated a specific test for second-prong plain error: whether the omitted instruction created a serious risk that the jurors incorrectly convicted the defendant because they did not understand the applicable law, so as to severely threaten the fairness of the trial. *Sargent*, 239 Ill. 2d at 190-91. We first address why the error was not second-prong plain error, then turn to the first prong.

¶ 58     Defendant cannot show that the exclusion of the instruction created a serious risk that the jury misunderstood the law because the trial court gave a nearly identical instruction to the jury. IPI Criminal 4th No. 3.06-3.07 states in full:

> "You have before you evidence that [(the) (a)] defendant made [a] statement[s] relating to the offense[s] charged in the [(indictment) (information) (complaint)]. It is for you to determine [whether the defendant made the statement[s], and, if so,] what weight should be given to the statement[s]. In determining the weight to be given to a statement, you should consider all of the circumstances under which it was made." (Alterations in original.)

The court's instruction, which recited a portion of IPI Criminal 4th No. 3.11, was nearly identical to that instruction:

> "[Y]ou may consider a witness's earlier inconsistent statement as evidence without this limitation when the statement narrates, describes or explains an event or condition the witness has personal knowledge of. It is for you to determine whether the witness made the earlier statement and if so what weight should be given to that statement. In determining the weight to be given to an earlier statement, you should consider all of the circumstances under which it was made."

¶ 59    Like IPI Criminal 4th No. 3.06-3.07, the court's instruction informed the jury that it should determine whether the witness made the earlier statement and what weight that statement should be given. The court's instruction further told the jury to consider "all of the circumstances" under which the statement was made in deciding its weight. Moreover, defendant cannot show that the jury did not apply the court's instruction to defendant's prior statements. The court's instruction applied to "inconsistent statement[s]," such as defendant's prior admissions that Breed was armed. Defendant's prior statement described an event of which he had personal knowledge: his robbery of Williams. The court further informed the jury that it should treat defendant's testimony like that of any other witness. These instructions conveyed the same principles as IPI Criminal 4th No. 3.06-3.07.

¶ 60    We find support for this conclusion in *People v. Johnson*, 385 Ill. App. 3d 585, 599-600 (2008), where, in the context of an ineffective assistance of counsel argument, the court found that the same instructional error did not prejudice the defendant. Like this case, the jury in *Johnson* received only IPI Criminal 4th No. 3.11. *Id.* at 599-600. The court concluded that, because IPI Criminal 4th No. 3.11 and IPI Criminal 4th No. 3.06-3.07 were essentially identical, the defendant could not show that he suffered prejudice from the omission of IPI Criminal 4th No. 3.06-3.07. *Id.* at 600. We find that the rationale of the court in *Johnson* applies with greater force in this case. Whereas the defendant in *Johnson*—who asserted an ineffective assistance of counsel claim—was simply required to show that the omission of IPI Criminal 4th No. 3.06-3.07 created a *reasonable probability* that the fairness of his trial was undermined (*Johnson*, 385 Ill. App. 3d at 598), defendant in this case must show that the omission of IPI Criminal 4th No. 3.06-3.07 created a *serious risk* that the jury misunderstood the applicable law in such a way that the fairness of his

trial was in jeopardy. *Sargent*, 239 Ill. 2d at 190-91. In light of defendant's higher burden in this case, we find *Johnson* to be persuasive.

¶ 61    Defendant cites *People v. Turman*, 2011 IL App (1st) 091019, in support of his second-prong plain error argument, but *Turman* involved a more confusing set of jury instructions. In *Turman*, the jury was given *both* IPI Criminal 4th No. 3.06-3.07 and IPI Criminal 4th No. 3.11. *Id.* ¶¶ 28, 32. However, the version of IPI Criminal 4th No. 3.06-3.07 given to the jury did not include the portion of the instruction telling the jury that it was for them to decide whether the defendant had made the incriminating statement. *Id.* ¶ 28. The version of IPI Criminal 4th No. 3.11, on the other hand, did include that language. *Id.* ¶ 32. Because one instruction told the jury that it could decide whether a witness made a prior statement, while the other did not, the jury might have incorrectly concluded that they could not determine whether the defendant made his statement. *Id*. ¶ 33. In this case, by contrast, the only instruction given to the jury about witnesses' prior statements correctly told them that it was for them to decide whether the witness made the statement. The jury did not have to reconcile conflicting instructions. Therefore, the risk that the jury would apply differing standards to defendant's statement and other witnesses' prior statements was not present in this case.

¶ 62    Defendant also contends that this error constituted plain error because the evidence at trial was closely balanced. However, as we stated above, the evidence against defendant was strong. Thus, defendant cannot show that the court's error threatened to tip the balance of the evidence in the State's favor. Moreover, the omission of IPI Criminal 4th No. 3.06-3.07 was harmless beyond a reasonable doubt because the jury received a nearly identical instruction to IPI Criminal 4th No. 3.06-3.07. See *People v. Leach*, 2012 IL 111534, ¶ 141 (harmless error "certainly cannot rise to the level of plain error"); *People v. Pomykala*, 203 Ill. 2d 198, 210 (2003) (error in jury instructions

will be considered harmless if result of trial would not have been different if jury had been properly instructed). With instructions laying out the same legal principles as the omitted instruction, the result of the trial would have been the same even had the trial court not erred.

¶ 63          3. *Evidence Of Williams's Interest In The Police Investigation*

¶ 64    Defendant next claims that the trial court erred in sustaining the State's objection to his questioning Williams about whether Williams thought the police would investigate this case more thoroughly if he told them that Breed had a gun. The trial court found that this question called for a speculative answer. On appeal, defendant claims that the question was not speculative; it sought to provide a reason why Williams would lie about Breed having a gun. The State counters that defendant has forfeited this issue, and that the trial court properly excluded testimony that would have amounted to Williams speculating on police practice.

¶ 65    Defendant acknowledges that he forfeited review of this issue by failing to include it in a posttrial motion. See *Denson*, 2014 IL 116231, ¶ 11. However, defendant urges us to review this error under the first prong of plain error. We begin by determining whether the trial court erred in limiting defendant's cross-examination. *Sargent*, 239 Ill. 2d at 189. We apply an abuse of discretion standard to this question. *People v. Kliner*, 185 Ill. 2d 81, 130 (1998).

¶ 66    We agree with defendant that the question posed by defense counsel did not call for a speculative response. Defense counsel asked Williams two questions about what he thought the police would do if he told them Breed had a gun. First, she asked, "[W]hen you told the police officer that you were robbed at gunpoint, you thought that—you told the police officer that because *you thought* that they would be more likely to catch the person?" (Emphasis added.) Second, she asked, "Did *you think* the police officer would look for the person if they didn't have a gun?" (Emphasis added.) Defense counsel explained that these questions went to Williams's state

of mind. In other words, they were an attempt to elicit testimony that would suggest that Williams had an incentive to lie about the presence of the gun, *i.e.*, that he thought the police would be more likely to pursue the robbers if he said they were armed. Defendant did not ask Williams to speculate as to whether the police were *in fact* more likely to investigate robberies committed with firearms than those committed without firearms. Thus, the trial court erred in ruling that defense counsel's question called for speculation. See, *e.g.*, *People v. Morris*, 162 Ill. App. 3d 1046, 1051-52 (1987) (counsel's question asking defendant what he thought victim was going to do to him did not call for speculation into victim's intent; it went to defendant's state of mind and whether he acted in self-defense).

¶ 67    However, even though the trial court erred in excluding this evidence, defendant cannot establish that it constituted first-prong plain error. See Ill. S. Ct. R. 615(a); *Belknap*, 2014 IL 117094, ¶ 48 (first prong of plain error applies where evidence is so closely balanced that error threatened to tip scale in favor of State). As we explained above, the evidence against defendant was overwhelming. We hold defendant to his forfeiture of this issue.

¶ 68    We also note that, if defendant had been permitted to continue with this line of questioning, it was unlikely that he would have uncovered evidence to support his case. When defense counsel first asked Williams whether he told the police that Breed had a gun because he thought it would make the police more likely to catch Breed, before the State objected, Williams answered, "No." Defense counsel's second question in this line of questioning, which merely rephrased the first question, would have likely elicited the same answer. While we cannot be certain whether Williams would have provided helpful evidence for the defense, his answer to counsel's first question—the only answer we have on the record—suggests otherwise.

¶ 69                4. *Perfecting The Impeachment Of Williams*

¶ 70    Defendant's final contention of error relating to his right to present a defense is that the trial court erred in preventing him from perfecting his impeachment of Williams. On the first day of trial, defense counsel asked Williams if he told Detective Escalante that Breed went through his pockets and then drew the gun. Williams denied saying that. Those facts would conflict with Williams's trial testimony, in which he said that Breed drew the gun at the beginning of the robbery and did not go through his pockets. The next day, defense counsel planned to call Escalante to testify that Williams did tell him those things. However, Escalante was unavailable because he had apparently gone on medical leave. Defense counsel moved for a mistrial because she could not perfect her impeachment of Williams without Escalante. The trial court denied defense counsel's motion because defense counsel had not served Escalante with a subpoena.

¶ 71    On appeal, defendant for the first time claims that the trial court should have ordered a continuance so that defense counsel could secure Escalante's appearance. The State responds that defendant forfeited this issue because he did not ask for a continuance below and that the trial court had no duty to *sua sponte* order one.

¶ 72    We apply an abuse of discretion standard of review to this issue. See *People v. Walker*, 232 Ill. 2d 113, 125 (2009) (decision to grant or deny continuance is subject to abuse of discretion standard). An abuse of discretion occurs where a trial court's decision is arbitrary, fanciful, or unreasonable. *People v. Ortega*, 209 Ill. 3d 354, 359 (2004).

¶ 73    Defendant's argument is undercut by the fact that he never sought the continuance he now claims the court should have granted. Instead, at trial, defense counsel sought a mistrial due to Escalante's absence. Defendant acknowledges this fact but argues that the trial court should have taken it upon itself to order a continuance in the interests of justice.

¶ 74 This court has repeatedly rejected the notion that trial courts possess an obligation to *sua sponte* continue cases, even where the denial of a continuance may prejudice the defendant. *E.g.*, *People v. Smith*, 2012 IL App (4th) 100901, ¶ 138 (trial courts do not have duty to *sua sponte* continue case after State amends charging instrument); *People v. Wilder*, 325 Ill. App. 3d 987, 995 (2001) (trial court not required to *sua sponte* continue trial for defendant to obtain civilian clothes to wear in front of jury); *People v. Barnes*, 130 Ill. App. 3d 1026, 1030 (1985) (trial court did not have duty to *sua sponte* continue trial to permit defendant to subpoena expert witness to support his case). Defendant offers no persuasive reason why we should depart from this principle or why defense counsel could not have asked to continue the trial.

¶ 75 Defendant cites *People v. Amos*, 204 Ill. App. 3d 75, 83 (1990), but it appears that the defendant in that case requested a continuance to locate a witness to perfect the impeachment of another witness for the State. Although the court did not expressly say that the defendant had requested a continuance, the court in *Amos* framed the defendant's argument as whether the court "abused its discretion in *denying* the defense a continuance." (Emphasis added.) *Id.* This suggests that the defendant asked for, but was denied, a continuance. Moreover, even if the defendant in *Amos* had not requested a continuance, he represented himself (albeit with standby counsel). *Id.* at 80. The trial court's obligations with respect to a *pro se* defendant may differ from those where, as in this case, the defendant is represented by counsel. Here, the trial court did not have a duty to request a continuance on defense counsel's behalf.

¶ 76 We recognize that Detective Escalante's absence precluded defendant from perfecting his impeachment of Williams. However, it was incumbent on defense counsel to request a continuance in order to secure his presence. Defense counsel did not do that. Instead, she asked for a mistrial. Before this court, defendant does not assert that the trial court erred in denying his

motion for a mistrial, thereby forfeiting that issue. See Ill. S. Ct. R. 341(h)(7) (eff. Feb. 6, 2013); *People v. Dabbs*, 239 Ill. 2d 277, 294 (2010) (party forfeits review of issue that he does not argue on appeal).

¶ 77 We also note that, even if defendant had received a continuance to secure Escalante's presence, the impeachment he would have offered would have been relatively minor. Escalante would simply testify that Williams told him that Breed went through his pockets, then pulled out a gun. This would contradict Williams's trial testimony, where he said that Breed pulled out the gun before going through his pockets. This slight discrepancy in the sequence of events would not have significantly undermined the major points of Williams's testimony, including the crucial fact that Breed had a gun during the robbery. We cannot conclude that the trial court had a duty to order a continuance *sua sponte*, let alone that the failure to do so was an abuse of discretion.

¶ 78                                    5. *Cumulative Error*

¶ 79 Finally, defendant contends that, when all of the collective errors at his trial are viewed together, he was deprived of his right to present his defense. Defendant is correct that, although any individual error may not constitute reversible error, the cumulative impact of errors may necessitate a new trial. *People v. Speight*, 153 Ill. 2d 365, 376 (1992). However, we do not believe that this case presents such an instance.

¶ 80 Viewing the record as a whole, defendant was able to present his defense adequately. He testified that Breed did not have a gun, and was allowed to explain why he signed a confession saying otherwise. Defendant received a jury instruction that, while incorrect in form, correctly informed the jury that it should decide whether defendant made his incriminating statement and that it should consider all of the circumstances surrounding that statement. Although the trial court prevented defendant from inquiring into Williams's possible interest in lying about the presence of

a gun, that ruling did not constitute first-prong plain error because the evidence at defendant's trial was not closely balanced. Finally, the trial court was under no obligation to *sua sponte* grant defendant a continuance. As each of the errors either had a minor impact or no impact at all, defendant has not shown that, taking them together, they deprived him of his right to present his defense.

¶ 81    The dissent contends that the errors in this case were so numerous that a new trial is required. Citing *People v. Blue*, 189 Ill. 2d 99 (2000), the dissent argues that, regardless of the strength of the evidence against defendant, there are circumstances where trial errors are so numerous and so severe that we must order a new trial in order to preserve the integrity of the judicial process. While we do not take issue with the dissent's recitation of the rule in *Blue*, we do not think this is a case where we must invoke that rule. In *Blue*, the defendant was on trial for murdering a police officer. *Id.* at 105-09. In its case-in-chief, the State introduced the officer's uniform, which was covered with blood and brain-matter stains and torn from the paramedics' attempts to save the officer's life. *Id.* at 120. Moreover, the State draped the tattered uniform on a mannequin that stood in the courtroom during a large portion of its case-in-chief, and the trial court provided the jury with rubber gloves so that they could handle the uniform during deliberations. *Id.* at 121. During the State's rebuttal closing argument, it told the jury that the officer's family " 'need[ed] to hear from [the jury] that they will get justice,' " and that "every police officer" in Illinois "need[ed] to hear from [the jury]." *Id.* at 128. The supreme court held that the "synergistic effect" of the uniform and the improper closing argument required a new trial, regardless of the strength of the evidence against the defendant. *Id.* at 139. The court noted that these errors "encouraged the jury to return a verdict grounded in emotion" and that the state possessed "an intent *** to place the jury's responsibility as citizens on trial." *Id*. at 139, 140.

¶ 82    No similar appeal to the jury's emotions or passions occurred in this case. Although the trial court made several incorrect rulings, they did not deprive defendant of his fundamental right to present his defense—he testified that Breed was not armed and that his confession was false—or to challenge the State's case. We see no overreaching on the State's part in an attempt to appeal to the jury's emotions. While we do not, by any means, condone or encourage the trial court's numerous errors, the errors in this case do not rise to the same level as those in *Blue*, such that reversal is required regardless of the strength of the evidence.

¶ 83    The dissent also takes issue with our characterization of the evidence against defendant as "overwhelming," first noting that Williams's testimony was inconsistent with his prior statement to his mother. We find no significant inconsistency between the two. While Williams did not specifically tell his mother that Breed was armed when he first recounted the robbery to her, neither did he tell her that Breed was *unarmed*; he simply did not discuss the detail of the weapon when he first talked to her, before they went to the police. In his words at trial, Williams testified that he "didn't come out and exactly say that [to his mother], no." This issue was not further developed at trial, so we cannot be sure why Williams omitted that detail when talking with his mother. It is also worth reminding that everything else that Williams said at trial—that he was robbed, what was stolen, and the fact that defendant and an accomplice were the perpetrators—was admitted as true by defendant at trial, and that defendant's statements strongly corroborated Williams's testimony that Breed had a gun.

¶ 84    The dissent's second basis for concluding that the evidence is not overwhelming is that Detective Escalante's testimony was inconsistent with ASA Berg's testimony from the pretrial suppression hearing, where Berg testified that she did not read defendant's handwritten statements to him. But even if Escalante was incorrect in testifying that Berg read the statement to defendant,

this fact does not render the written statement untrustworthy, especially since defendant's mother was present when defendant gave the statement. Moreover, defendant initialed the statement where any changes were made, suggesting that defendant had an opportunity to review his statement to approve or reject any changes.

¶ 85 Finally, the dissent notes that we must take defendant's evidence into account when deciding whether the evidence was overwhelming. We have. But compared to the State's evidence, defendant's case was weak. Defendant's theory of the case breaks down as follows: (1) Williams lied about the presence of a gun, though he told the truth about everything else; (2) Detective Escalante coerced defendant into admitting that his accomplice used a gun during the robbery; and (3) defendant never read the statement in which he admitted that his accomplice used a gun, even though both he and his mother signed every page of that statement and initialed numerous corrections to the statement. None of these propositions create a reasonable doubt that the jury could reach a different outcome on retrial.

¶ 86 It is unreasonable to believe that Williams lied to the police about the presence of a gun because he thought it would make the police more enthusiastic about catching the perpetrators. The dissent does not acknowledge that Williams was asked that very question—whether he mentioned a gun because he thought it would make the police "more likely to catch the person"—and Williams answered "no" before the judge sustained the objection to the question. That aside, given that Williams told the truth, by defendant's admission, about every other aspect of the crime, the notion that he lied about this one significant detail based on some hidden agenda to motivate the police department is a stretch, to say the least.

¶ 87 It is even harder to believe that, despite defendant's claim that he insisted that his accomplice was unarmed, Escalante coerced defendant into admitting that Breed had a gun and, in

cahoots with ASA Berg, fabricated defendant's written statement, which defendant and his mother initialed and signed in several places without reviewing. It would require a complete suspension of disbelief to accept that defendant did not know he was signing a statement confessing to the crime and to the presence of a firearm in that crime. His claim that he thought he was signing a "notice of his rights" is unbelievable, considering that he had *already signed* a statement clearly marked as a "Notice of Rights." In fact, he signed that notice of rights twice and initialed it in six places; his mother also signed it. His written statement, in contrast, was clearly entitled, "Statement of Marlon Minter" and contained five pages of handwritten detail. By our count, defendant signed that statement in six separate places and his mother in five; he and his mother each placed their initials next to corrections in eight separate places in that statement. The notion that defendant did not know what he was signing strains all credibility. Although we reach that conclusion independently of anything that took place during the hearing on the motion to suppress defendant's statement, we would note parenthetically that the trial court heard this same testimony from defendant at the suppression hearing, and the trial court characterized the notion that defendant did not read the statement before signing it as "hogwash" and found "no basis whatsoever" for defendant's claim of coercion.

¶ 88    When considering defendant's case against Williams's testimony, defendant's oral statement to Escalante, and defendant's written statement, each of which was consistent with one another, we are left with no reasonable doubt regarding the outcome of defendant's trial. No rational jury would have acquitted defendant based on that evidence.

¶ 89                                B. Defendant's Tattoos

¶ 90    Defendant raises three challenges to the trial court's rulings regarding his tattoos:

1. That the trial court erred in precluding him from using makeup to cover the tattoos on his face;

2. That the trial court incorrectly permitted the State to cross-examine defendant about tattoos on his arms that were not visible to the jury and about which defendant did not testify on direct examination; and

3. That the trial court erred in refusing to give a modified instruction telling the jury to disregard defendant's tattoos.

We address each contention in turn.

¶ 91                                      1. *Makeup To Cover Tattoos*

¶ 92    Defendant first claims that the trial court erred in precluding him from applying flesh-toned makeup to conceal the tattoos on his face. Defendant argues that the tattoos were irrelevant to any issue in the case because he did not have them at the time of the robbery and, in any event, his identity was not at issue. Defendant also claims that his inability to cover his tattoos prejudiced him because they "were likely to offend or frighten" the jurors. The State contends that the court acted within its discretion in denying defendant's request, and that there was no prejudice to defendant because no evidence was introduced linking defendant's tattoos to gangs or other criminal activity.

¶ 93    Before reaching the substance of defendant's argument, we must resolve the parties' conflict over the correct standard of review. Defendant, citing *People v. Miklos*, 393 Ill. App. 3d 205 (2009), argues that we should apply *de novo* review because the trial court's ruling deprived him of his due process right to a fair trial. However, the issue in *Miklos* was whether a delay in a hearing on the suspension of defendant's driver's license deprived him of due process. *Id.* at 209-10. It did not deal with a trial court's ability to regulate the appearance of the defendant or

witnesses during a trial, an issue to which courts have applied an abuse of discretion standard. *E.g.*, *People v. Boose*, 66 Ill. 2d 261, 267 (1977) (decision to shackle defendant is subject to abuse of discretion standard); *People v. Bowman*, 2012 IL App (1st) 102010, ¶¶ 61-62 (decision to allow defense witnesses to testify in civilian clothing or prison attire is subject to abuse of discretion). We find that *Miklos* is inapplicable and apply an abuse of discretion standard.

¶ 94    Turning to the substance of defendant's argument, neither defendant nor the State cites to any relevant Illinois precedent on this issue. We have not uncovered any, either. However, other jurisdictions have dealt with this issue. We look to those decisions to inform our analysis.

¶ 95    In *Jackson v. United States*, 945 A.2d 621, 623 (D.C. Ct. App. 2008), the defendant claimed that the trial court erred in denying his motion to permit him to use cover-up makeup to conceal a teardrop tattoo on his face. Defendant argued that the tattoo amounted to other-crimes evidence because " '[i]n some circles, the presence of a teardrop tattoo means that the person wearing it has killed somebody.' " (Alteration in original.) *Id.* On appeal, the District of Columbia Court of Appeals rejected the contention that the tattoo amounted to other-crimes evidence, finding that the meaning of the tattoo was open to interpretation and did not definitively signal criminal behavior. *Id.* at 626. Though it acknowledged the possibility that jurors would interpret the tattoo negatively, the court found that the trial court did not abuse its discretion in denying the defendant's motion because the defendant was not prejudiced. *Id.* The court also noted that two of the State's witnesses relied upon the tattoo in identifying the defendant. *Id.* at 627.

¶ 96    In *State v. Ross*, 115 So. 3d 616, 622 (La. Ct. App. 2013), the trial court granted the State's motion *in limine* to prevent the defendant from covering the teardrop tattoos on his face with makeup. The court found that the defendant's tattoos were relevant to establish his identity because one of the State's witnesses identified him by the tattoos. *Id.* at 623. The court also found that the

jury's being able to see the tattoos did not prejudice the defendant because no testimony was elicited regarding their meaning. *Id.*

¶ 97 Finally, in *State v. Ortiz*, 300 P.3d 786, 787 (Utah Ct. App. 2013), the Court of Appeals of Utah rejected the defendant's argument that he should have been permitted to cover his facial tattoos because they were irrelevant and unfairly prejudicial. The court rejected the fundamental premise of the defendant's argument: that his facial tattoos were even evidence that could be considered irrelevant or prejudicial. *Id.* According to the court, the tattoos were simply part of the defendant's general appearance and were not subject to the limits of the rules of evidence. *Id.* The court noted that neither the State nor any of the witnesses referred to the tattoos during his trial. *Id.* at 788. None of the witnesses identified the defendant via his tattoos. *Id.* at 788, n.2. The court also noted that tattoos are not inherently prejudicial in the same way as prison clothing or handcuffs. *Id.*

¶ 98 We can draw several principles from these cases that apply to this case. Like the teardrop tattoos at issue in each of these cases, defendant's tattoos were never given a negative meaning. To the contrary, defendant attached innocuous meanings to each of his tattoos in his testimony. The State introduced no gang evidence to rebut this testimony and made no argument that defendant's tattoos should be negatively interpreted. As the court in *Ortiz* stated, tattoos do not carry the same inherently prejudicial effect as prison clothing or handcuffs. While defendant's tattoos did not serve a relevant purpose like identification, they were simply a part of his general appearance until he elected to explain their meaning. Until that point, defendant's tattoos did not even constitute evidence that would be required to meet the standard of relevancy.

¶ 99 We also reject defendant's contention that the trial court's ruling compelled him to exercise his right to testify and waive his right to remain silent. Defendant elected to explain the meaning of his tattoos to the jury, fearing that the jury would draw negative inferences from them. However,

the mere fact that defendant sought to avoid the prejudicial effect of his appearance does not render his waiver of his right to silence involuntary. *Cf. People v. Poe*, 16 Ill. App. 3d 805, 805-07 (1974) (proper admission of other-crimes evidence did not compel defendant to testify to dispel prejudicial effect of that evidence); *People v. Tillman*, 116 Ill. App. 2d 24, 32 (1969) (defendant was not compelled to testify to explain why he fled after State introduced evidence of flight). As the trial court noted, defendant chose to get the tattoos; no one compelled him to. Likewise, no one compelled him to explain their meaning in court.

¶ 100   Defendant cannot show that allowing the jury to see his unaltered physical appearance was reversible error. Defendant chose to tattoo his own face and then chose to explain the meaning of those tattoos to the jury. The State presented no evidence to give a negative meaning that would have necessitated such explanation. We conclude that the trial court did not commit error in precluding defendant from covering his facial tattoos with makeup.

¶ 101                    2. *State's Cross-Examination About Other Tattoos*

¶ 102   Defendant also contends that the trial court erred in permitting the State to order him to roll up his sleeves and show the jury additional tattoos that were otherwise not visible. Defendant argues that this action exceeded the scope of his direct examination, which focused solely on the tattoos that the jury could see. The State contends that defendant opened the door to its cross-examination about his other tattoos by testifying as to the meaning of his facial tattoos and that, in any event, the tattoos on his arms had no prejudicial effect on this case.

¶ 103   The scope of cross-examination is left to the discretion of the trial court. *People v. Stevens*, 2014 IL 116300, ¶ 16. Accordingly, we will only reverse a trial court's decision regarding the scope of cross-examination if that decision constituted an abuse of discretion. *Id.*

¶ 104 Defendant analogizes his being compelled to display the tattoos on his arms to the prosecutor's improper cross-examination in *People v. Hernandez*, 313 Ill. App. 3d 780 (2004). In *Hernandez*, two eyewitnesses identified the defendant as one of the people fleeing the scene of the offense. *Id.* at 787. They also testified that he was wearing a short-sleeved shirt at the time, but did not mention any tattoos on his arms. *Id.* In an effort to discredit their testimony, the defendant presented several witnesses who testified that the defendant had prominent tattoos on his arms. *Id.* In cross-examining those witnesses, the State asked whether they were aware that the defendant had a tattoo of a devil on his chest. *Id.* The court found that the State impermissibly exceeded the scope of the direct examination of the defense witnesses because the only relevant tattoos were the ones that would have been visible during the incident, *i.e.*, the ones on the defendant's arms. *Id.* Ultimately, the court concluded that this error was harmless because the evidence against the defendant was overwhelming. *Id.* at 787-88.

¶ 105 In this case, like *Hernandez*, the trial court erred in allowing the State to inquire about defendant's tattoos that were not visible to the jury. The inquiry went beyond the scope of defendant's direct examination, which was limited to an explanation of defendant's *visible* tattoos. The State's questions were irrelevant to any issue at trial.

¶ 106 We further find, however, that this error, like the error in *Hernandez*, was harmless beyond a reasonable doubt. None of the tattoos that defendant was required to show the jury carried any obvious negative connotation. To the contrary, defendant's tattoos depicted his nickname, the word "Chief," and his mother's name. None of those tattoos are patently prejudicial like the defendant's devil tattoo in *Hernandez*. Moreover, the State did not attempt to draw any negative inferences from any of defendant's tattoos in its closing argument.

¶ 107   While defendant contends that "[i]t is well known that gang leaders are referred to as 'chief,' " no evidence at defendant's trial provided the jury with that information. Defendant cites two cases, *People v. Hairston*, 46 Ill. 2d 348, 352 (1970), and *People v. Barajas*, 322 Ill. App. 3d 541, 549 (2001), in support of his contention, but in both of those cases the State introduced evidence that gang leaders are called "chiefs." We cannot simply assume that the jury ascribed that meaning to the word "chief" in this case, where there was absolutely no gang evidence presented. Thus, even if the court erred in permitting the State to have defendant display his arm tattoos, that error was harmless beyond a reasonable doubt.

¶ 108              3. *Modified Jury Instructions Regarding Tattoos*

¶ 109   Defendant next argues that the trial court erred in denying his request to deliver one of four modified versions of Illinois Pattern Jury Instructions, Criminal, No. 1.01 (4th ed. 2000), telling the jurors that they should not consider his tattoos in reaching their verdict. We review the trial court's decision for an abuse of discretion. *People v. Dorn*, 378 Ill. App. 3d 693, 698 (2008). For many of the reasons we have just given, we find no abuse of discretion. Defendant testified that his tattoos had innocuous meanings, in some instances giving testimony about the tattoos' symbolic references to his deceased family members that likely painted him in a sympathetic light with the jury but, in any event, certainly did not prejudice him. And though the State's cross-examination on this topic was overly broad, it did not result in the admission of prejudicial evidence. Thus, defendant has not shown that his proposed jury instructions were necessary to alleviate the effects of any prejudicial evidence.

¶ 110   Defendant claims that *People v. Newsom*, 452 F.3d 593 (6th Cir. 2006), is persuasive in this case. We disagree. In *Newsom*, the State elicited testimony that the defendant, who was on trial for possessing a firearm, had tattoos of firearms on his neck and body. *Id.* at 597, 599. The trial

court instructed the jury that it was not to consider the defendant's tattoos as evidence that he actually possessed a firearm. *Id.* at 600. On appeal, the Sixth Circuit Court of Appeals found that the trial court erred in permitting the State to elicit evidence of the defendant's tattoos, but concluded that that error was harmless in part because the trial court instructed the jury to not rely on the defendant's tattoos as evidence of his guilt. *Id.* at 600-05. This case is distinct from *Newsom* because this case did not involve the admission of any prejudicial tattoo evidence. Whereas the State in *Newsom* presented evidence that the defendant had a tattoo of the very item he had been accused of possessing, the jury in this case heard no prejudicial evidence regarding defendant's tattoos. We find no error in the trial court's rejection of defendant's proposed instructions.

¶ 111                     C. Judicial Bias And Hostility

¶ 112   Defendant also claims that the trial court displayed a biased and hostile attitude toward the defense throughout the proceedings. He argues that the trial court made improper comments in the presence of the jury, threatening his ability to receive a fair trial.

¶ 113   The State first argues that defendant forfeited review of this issue by failing to include it in his posttrial motion. Defendant counters that this court should relax the rules of forfeiture as to this issue because it involves the conduct of the trial judge. Defendant's argument relies upon the doctrine, first recognized in *People v. Sprinkle*, 27 Ill. 2d 398, 400-01 (1963), that a trial attorney should not be expected to object to the trial judge's comments or conduct during proceedings before that same judge. In *People v. McLaurin*, 235 Ill. 2d 478, 485-89 (2009), the Illinois Supreme Court clarified that the *Sprinkle* doctrine should be applied only in extraordinary circumstances where an objection would have " 'fallen on deaf ears.' " The supreme court explained that its application of this rule "closely resemble[d]" the application of second-prong plain error, *i.e.*, where an error is so serious that it threatens the integrity of the judicial process. *Id.*

at 487. Defendant also argues that, even if *Sprinkle* does not apply, we should excuse his forfeiture based upon the first prong of the plain error doctrine because the evidence against him was closely balanced. See Ill. S. Ct. R. 615(a); *People v. Belknap*, 2014 IL 117094, ¶ 48.

¶ 114 We first examine whether the trial court's comments constituted error. Then, we turn to whether we should relax the forfeiture rule under *Sprinkle*. Finally, we consider defendant's first-prong plain error claim.

¶ 115                    1. *Whether The Trial Court's Comments Were Improper*

¶ 116 While trial judges have wide discretion in presiding over trials, they may not make comments or insinuations showing their opinion on witnesses' credibility or counsel's arguments. *People v. Tatum,* 389 Ill. App. 3d 656, 662 (2009). Moreover, a hostile attitude toward a criminal defendant, his witnesses, or his attorney may improperly influence the jury in reaching its verdict, resulting in an unfair trial. *People v. Eckert*, 194 Ill. App. 3d 667, 674 (1990).

¶ 117 Defendant first takes issue with three of the trial court's comments before his trial began. Defendant argues that the trial court twice refused to enter an order letting him make phone calls to his mother from Cook County Jail even though he was only 17 years old, that the trial court told defendant he was "stuck" with a trial date because he demanded a speedy trial, and that the trial court made comments suggesting that defendant should be prejudiced by the fact that he had received facial tattoos since the offense.

¶ 118 We disagree that any of these alleged comments affected defendant's trial. First, none of them were made in the presence of the jury. Therefore, it is difficult to see how any of these comments could have affected the verdict in this case. See *People v. Lopez*, 2012 IL App (1st) 101395, ¶¶ 70-71 (comments trial judge made to defense counsel during sidebars held in chambers did not affect jury's verdict).

¶ 119   Second, none of these comments were improper. With respect to the phone calls, the trial judge explained that he would not sign orders compelling jail officials to allow defendant to make phone calls because defendant had been charged with a new offense while in prison and categorized as "high risk" by the jail. As to the trial date, defendant ignores the fact that his attorney acquiesced to the trial date. After demanding trial, defense counsel said, "Judge, I think in good faith the State can certainly pick any date that they want." Finally, as to the trial court's comments about defendant's tattoos, defendant misconstrues the trial court's statements. The trial judge did not say that defendant should be prejudiced by his tattoos; the court said that defendant was not entitled to put on makeup, potentially obscuring his appearance, simply because he elected to get tattoos on his face. We see no impropriety in any of these comments.

¶ 120   Defendant next argues that the trial court made three improper and prejudicial comments during defense counsel's cross-examination of Detective Escalante. The first occurred after defense counsel elicited testimony from Escalante that ASA Berg's summary of defendant's report was not verbatim. Counsel asked Escalante, "[S]he did not write down everything that was said?" Defense counsel pressed Escalante for a yes-or-no answer, and the following colloquy occurred:

"MR. EVANS [Assistant State's Attorney]: Objection, it has been asked and answered[.]

THE COURT: Sustained.

MS. SNEED [Defense counsel]: I don't think that we got a 'yes' or 'no' answer.

THE COURT: He said that it was not word for word. Not verbatim means not word for word. So obviously that means that there were some words that may have been left out."

¶ 121   The second allegedly improper comment occurred when defense counsel was cross-examining Escalante about his search for Breed and the gun that was purportedly used

during the robbery. Escalante testified that defendant told him that someone named "Breed," who had the gun, lived somewhere on 146th Street in Harvey. The trial court sustained the State's objection to counsel's follow-up question: "And so you knew a nickname, you knew a first name, and you knew an approximate location of where Breed lived?" The court also sustained the State's objection to defense counsel's asking Escalante whether he ever arrested Breed. Then, counsel began to ask, "Now, you are telling us that you had a name of a person—," when the State objected again. The court responded, "Counselor, that is totally sustainable. It has got no basis whatsoever as to—based on any cross-examination."

¶ 122 The third allegedly improper comment was made when defense counsel questioned Escalante about his efforts to recover the gun. Defense counsel asked if Escalante took Williams's statement that Breed was armed "at face value," and Escalante said he did. Defense counsel then asked, "So [Williams] says that there was a gun, you never investigated where—to try to find the gun, you just took everything at face value?" The State objected to this question and the court said, "Sustained. That's not what he said." Escalante had previously testified that he searched for the gun after Williams reported the robbery.

¶ 123 The court's comments during defense counsel's cross-examination of Escalante were not improper. Defense counsel persistently tried to inquire as to whether Escalante had arrested or tried to arrest Breed, but the court sustained the State's objections to the relevance of that questioning. Defense counsel again began the same line of questioning, but the trial court admonished counsel, albeit in strong words, to desist. Notably, defendant does not claim that the trial court erred in precluding counsel from asking about whether Breed was arrested; he simply takes issue with the trial court's phrasing. However, in light of defense counsel's persisting in a line of questioning that the court excluded, it was not improper for the court to respond as it did. See

*Lopez*, 2012 IL App (1st) 101395, ¶¶ 74-77 (finding that trial court's criticisms of defense counsel in its rulings were not improper where defense counsel persisted in making errors in cross-examination and trial court's criticisms related to why questions were objectionable).

¶ 124 Similarly, after counsel misconstrued Escalante's testimony that he took Williams's complaint at face value as evidence that the police did not look for the gun, the trial court could permissibly sustain the State's objection. The trial court's comment was not improper; it was accurate. Escalante had testified, just moments before, that he did look for the gun involved. Likewise, the trial court permissibly explained the meaning of the word "verbatim" in response to defense counsel's repeated questioning about whether ASA Berg took down defendant's statement word for word. The trial court simply explained why it had sustained the State's objection; defense counsel had already received an answer to her question. The trial court's comments during defendant's cross-examination were thus proper attempts to clarify and expedite the trial. See *People v. Young*, 248 Ill. App. 3d 491, 502 (1993) (trial court's efforts to clarify and expedite examination of witness are not improper).

¶ 125 Defendant next challenges two comments made by the court during his own testimony. First, defendant argues that the trial court evinced a "lack of respect" by not immediately granting defense counsel's request for a sidebar when the State asked him to show the jury the tattoos on his arms:

> "Q. [Assistant State's Attorney:] Stand up and roll up your sleeves.
>
> MS. SNEED [Defense counsel]: Judge, I am going to object.
>
> THE COURT: Objection is overruled.
>
> MS. SNEED: Can I have a side bar?
>
> THE COURT: No, objection is overruled.

MS. SNEED: Excuse me. Can I have a side bar, Judge?

MR. VOLKMAN [Assistant State's Attorney]: Stand up and roll of [*sic*] your sleeves up.

MS. SNEED: Can I have a side bar?

THE COURT: Fine, let's have a side bar."

Then, at the sidebar, the court asked defense counsel, "All right. What's your objection this time?"

¶ 126   Defendant does not explain how these comments were improper, especially when the trial court granted the sidebar his attorney requested. Although the trial court's question at the sidebar was terse, it was not made in the presence of the jury.

¶ 127   Second, defendant takes issue with the trial court's comment after sustaining the State's objection to his testimony on redirect examination:

"Q. [Defense counsel:] And even though your weren't manhandled by the police, Detective Escalante did threaten to put other cases on you?

MR. VOLKMAN [Assistant State's Attorney]: Objection, leading, asked and answered.

THE COURT: Sustained. And it has been asked and answered 7 million times. Move on, Counselor."

¶ 128   This comment, while unnecessarily sarcastic, was otherwise a proper response to defense counsel's repeated questioning on the same topic. Just moments before, defendant had testified that he agreed to sign the statement prepared by ASA Berg because he did not want to be charged with any more cases. Defendant testified to the same facts during his direct examination. The trial court's comment was merely an attempt to stop defense counsel from repeating questions. *Lopez*, 2012 IL App (1st) 101395, ¶¶ 74-77.

¶ 129 Finally, defendant argues that, during his attorney's closing argument, the trial court improperly misconstrued Detective Escalante's testimony. Defense counsel attempted to argue that Escalante did not thoroughly investigate whether there was a gun because he did not actually believe that a gun was used during the robbery:

"But look at it this way. He was a detective for Harvey for 11 years. That's his job, to find criminals. [Defendant] told him Breed's nickname, he told him Breed's first name, he told him where Breed lived.

MR. VOLKMAN [Assistant State's Attorney]: Objection.

* * *

THE COURT: Sustained. That's not what he said.

MS. SNEED [Defense counsel]: He did say Breed lived on 146th Street in Harvey. That was the evidence.

THE COURT: That's about two miles long.

MS. SNEED: It may be two miles long.

THE COURT: That's what he testified to.

MS. SNEED: It may be two miles long, ladies and gentlemen, but Detective Escalante is not the only police officer on that force. He has a whole Harvey Police Department at his disposal.

If this were a murder, I bet they would have gone those two miles to find that gun or find that murder suspect. So it's not out of the realm of possibility that Detective Escalante could have found this gun and found this Breed."

Defendant contends that the trial judge misstated the evidence when he said that Escalante testified that 146th Street was two miles long. In actuality, defendant notes, Escalante simply testified that 146th Street ran across the city of Harvey.

¶ 130   We agree with defendant that the trial court's statement that 146th Street is "two miles long" was improper. The specific length of that street in Harvey was never put into evidence by Detective Escalante or anyone else; the detective merely testified that "146th Street runs across the City of Harvey from east to west." Moreover, the trial court improperly assumed a prosecutorial role in arguing with defense counsel about Detective Escalante's testimony. See *People v. Jackson*, 409 Ill. App. 3d 631, 647 (2009) (trial court abuses its discretion when it adopts role of either party). The trial court undermined defense counsel's argument by implying that 146th Street was too long to meaningfully inform Escalante of Breed's location. Thus, the trial court did not simply misstate the evidence; the trial court signaled to the jury that the evidence supporting counsel's argument was weak. This comment was error.

¶ 131   Defendant also argues that the trial court improperly curtailed defense counsel's closing argument while simultaneously granting the State substantial leeway in drawing inferences from the evidence. During her closing argument, defense counsel attempted to argue that, if Detective Escalante believed a gun was involved, he would have more thoroughly searched for Breed and the gun:

> "And buried in Detective Escalante's testimony I specifically asked him if he thought there were [*sic*] really a gun involved would he have looked for it, and he said yes. So Detective—
>
> MR. EVANS [Assistant State's Attorney]: Objection. That's not the testimony, Judge.

MS. SNEED [Defense counsel]: I wrote it down.

THE COURT: Overruled. It's argument.

MS. SNEED: That's what he said. So Detective Escalante didn't quite believe that there was a gun involved either.

MR. VOLKMAN [Assistant State's Attorney]: Judge, we're going to object to that last one. There's no evidence of that whatsoever.

THE COURT: Sustained.

What Detective Escalante['s] beliefs were are somewhat personal to him. Unless you could read his mind, because he did[n]'t say he did not believe there was a gun involved.

So the objection is sustained.

The jury is instructed to disregard the last statement."

Defendant then compares that ruling during defense counsel's closing argument with the trial court's ruling allowing the State to argue that defendant fabricated his defense despite the fact that there was no evidence to support it:

"Now, Mr. Minter knows about those consequences now after the 26 months you heard him talk about, after 26 months of being able to consult with his attorney and bone up on the law a little bit.

MS. SNEED [Defense counsel]: Objection.

THE COURT: It's argument. Overruled.

MR. EVANS [Assistant State's Attorney]: Because now he's had the opportunity to bone up on the law of armed robbery and accountability.

* * *

- 44 -

He didn't know when he told Detective Escalante that he and Breed robbed Mr. Williams with that gun about accountability. He didn't know when he told Assistant State's Attorney Desiree Berg that he and Breed robbed Markel Williams with a gun about accountability. He probably figured hey—

MS. SNEED: Judge, I'm going to object.

THE COURT: Basis?

MS. SNEED: That's not the evidence. That was not the evidence.

MR. EVANS: That's a reasonable inference from the evidence.

THE COURT: Reasonable inference from the evidence, overruled.

MR. EVANS: He didn't know about accountability when he had gave [*sic*] that five page confession to Assistant State's Attorney Desiree Berg on that day, bear in mind with his mother in the room, but he knows about it today.

MS. SNEED: Again, I'm going to object as to what Mr. Minter knew about accountability. That was not introduced into evidence.

THE COURT: Noted for the record. Overruled."

¶ 132   Viewing the trial court's rulings during the defense and State closing arguments in concert, we agree that the trial court improperly favored the State during its argument. In both instances, defense counsel and the State were attempting to undermine the credibility of one of their opponent's witnesses. Defense counsel argued that Escalante did not actually think that Breed was armed because he would have found the gun if he had. Defense counsel based that inference upon Escalante's testimony that he would look for a gun if he believed one was used, as well as the fact that no gun was recovered. Even though Escalante testified that he did look for the gun, defense

counsel was entitled to draw a contrary inference from other evidence. The trial court's ruling prevented defendant from so arguing.

¶ 133   However, as shown above, the trial court let the State make a similar argument, over defendant's objection. Arguably, the State's insinuation that defendant fabricated his testimony after his attorney told him about the law of accountability was improper in light of the fact that it lacked any evidence that defendant did not know of the law of accountability. See *People v. Kirchner*, 194 Ill. 2d 502, 549 (2000) (it is improper for prosecution to suggest that defense counsel fabricated defense theory unless there is some evidence on which to base those assertions); *People v. Conley*, 187 Ill. App. 3d 234, 250 (1989) (closing argument must be based on evidence or reasonable inferences drawn from evidence). However, whether the trial court erred in overruling defense counsel's objection is not critical to our analysis. Rather, the trial court's rulings during closing argument show that the trial court strictly limited defense counsel's argument while simultaneously allowing the State much more leniency. Although the trial court was not obligated to provide absolute parity in its rulings, the court must remain impartial and not display prejudice or favor toward either party. *Tatum*, 389 Ill. App. 3d at 662. In light of the inconsistency in its treatment of the parties' closing arguments, we find that the trial court erred. See *People v. Mitchell*, 228 Ill. App. 3d 167, 171 (1992) (trial court acted improperly in allowing State to explain law of accountability in its closing argument, but precluding defense counsel from arguing law as well).

¶ 134                    2. *Whether The* Sprinkle *Doctrine Should Apply*

¶ 135   Having found that the trial court abused its discretion during closing argument, we must still address whether we should excuse defendant's forfeiture of this issue because any objection by defense counsel would have fallen on deaf ears. *McLaurin*, 235 Ill. 2d at 487. Defendant contends

that, taken as a whole, the trial court's comments and rulings indicated that the trial court held a hostile and biased attitude toward the defense. Thus, according to defendant, he should not have been required to object to the trial court's comments.

¶ 136   Defendant cites *People v. Mitchell*, where this court ordered a new trial because of the trial court's displays of bias against, and hostility toward, the defense. *Mitchell*, 228 Ill. App. 3d at 169-71. In *Mitchell*, the trial court interrupted defense counsel's cross-examination of a witness who said he was interviewed by someone claiming to be from the " 'District Attorney's Office,' " bolstering that witness's testimony by saying that there was, in fact, such a thing as a district attorney in Illinois. *Id.* at 170. The appellate court noted that this not only undermined defense counsel's impeachment, but it added evidence in the State's favor. *Id.* The trial court also injected evidence in the State's favor by interrupting defense counsel's cross-examination regarding whether the defendant's interrogation was recorded, saying that tape recorders " 'are not used in police stations.' " *Id.* The trial court also "disparaged" defense counsel's questioning regarding the State's lack of fingerprint evidence, accused defense counsel of " 'ma[king] up' " impeachment evidence, and mocked the defendant's testimony while he was on the stand. *Id.* at 170-71. The trial court also displayed partiality during closing arguments, allowing the State to argue about the law but precluding the defense from doing the same. *Id.* at 171.

¶ 137   We find that *Mitchell* is distinguishable from this case. We recognize that, like the trial court in *Mitchell*, the trial court in this case improperly injected evidence during defense counsel's closing argument and ruled inconsistently during the parties' closing arguments. However, the sheer volume of disparaging remarks, the repeated introduction of evidence favoring the State, and clear bias against defense counsel in *Mitchell* was not present here. Instead, the trial court's impropriety was limited to two instances during closing argument. Unlike the trial court in

*Mitchell*, the trial court in this case did not display persistent disdain for the defense. Thus, we decline to apply *Sprinkle* based solely on what defendant describes as the trial court's hostility toward the defense.

¶ 138   Moreover, the record suggests that the trial court would not have ignored defense counsel's objections, as the rule in *Sprinkle* requires. We recognize that it would be unreasonable to expect defense counsel to further interrupt her own closing argument to object to the trial court's improper comments. See *People v. Saldivar*, 113 Ill. 2d 256, 266 (1986) (declining to apply forfeiture to issue of whether trial court considered improper factors in sentencing because defense counsel should not have been expected to interrupt court in midst of its findings in order to object). But defendant did not include any mention of these comments in his posttrial motion, either. In the same motion, he argued that the trial court's evidentiary rulings and rulings regarding defendant's tattoos were improper and deprived defendant of a fair trial. At the hearing on her posttrial motion, defense counsel vigorously argued that the trial court's rulings prejudiced defendant. The trial court heard these arguments, without interruption, before denying them. Nothing suggests that counsel would have been precluded from raising an additional objection regarding the court's comments during her closing argument. See *People v. Thompson*, 238 Ill. 2d 598, 612 (2010) (declining to apply *Sprinkle* because nothing in record suggested that trial court would have ignored an objection to its questioning of venire); *McLaurin*, 235 Ill. 2d at 488 (declining to apply *Sprinkle* because nothing suggested that trial court would not have entertained objections to its handling of jury notes). Because defendant has not shown that his objection would have fallen on deaf ears, we decline to relax the forfeiture rule pursuant to *Sprinkle*.

¶ 139                    3. *Whether The Evidence Was Closely Balanced*

¶ 140   Defendant also argues that, even if the trial court's comments do not justify relaxation of the forfeiture rule under *Sprinkle*, his conviction must be reversed because the evidence was closely balanced. See Ill. S. Ct. R. 615(a); *Belknap*, 2014 IL 117094, ¶ 48 (first prong of plain error applies where evidence is so closely balanced that error threatened to tip the scale in favor of the State). However, as we stated above, the State's evidence establishing defendant's guilt was strong. Therefore, we do not agree that the trial court's improper comments during closing argument threatened to unfairly tip the balance of the evidence against defendant.

¶ 141                              D. Constitutionality Of Automatic Transfer

¶ 142   Defendant next contends that the automatic transfer provision of the Juvenile Court Act of 1987, which required that he be tried as an adult for this offense (705 ILCS 405/5-130(1)(a)(iv) (West 2008)), violates the due process clauses of the United States and Illinois Constitutions, the Eighth Amendment to the United States Constitution, and the Proportionate Penalties Clause of the Illinois Constitution.

¶ 143   Since briefing was completed in this case, the Illinois Supreme Court decided *People v. Patterson*, 2014 IL 115102, ¶¶ 88-111, which rejected the identical challenges that defendant now raises. We must apply the holding of *Patterson* to this case. See *People v. Granados*, 172 Ill. 2d 358, 365 (1996) (Illinois Supreme Court decisions apply to all cases pending when decision is announced unless supreme court directs otherwise); *People v. Gillespie*, 2014 IL App (4th) 121146, ¶¶ 26-31 (applying *Patterson* because case was pending at time *Patterson* was decided). Although defendant's argument relies upon the United States Supreme Court cases of *Miller v. Alabama*, 567 U.S. ___, 132 S. Ct. 2455 (2012), *Graham v. Florida*, 560 U.S. 48 (2010), and *Roper v. Simmons*, 543 U.S. 551 (2005), the Illinois Supreme Court also considered those cases in upholding the automatic-transfer statute. *Patterson*, 2014 IL 115102, ¶¶ 96, 100. We must reject

defendant's challenges to the constitutionality of the automatic-transfer statute for the reasons stated in *Patterson*.

¶ 144                    E. Voidness Of The Armed-Robbery Firearm Enhancement

¶ 145    In his opening brief, defendant claimed that the 15-year firearm enhancement applied to his sentence was void because it had been held unconstitutional in *People v. Hauschild*, 226 Ill. 2d 63, 86-88 (2007). In his reply brief, defendant concedes that, since filing his opening brief, the Illinois Supreme Court held that Public Act 95-688 (eff. Oct. 23, 2007) revived the firearm enhancement. *People v. Blair*, 2013 IL 114122, ¶ 27. We must apply *Blair* to this case. *Granados*, 172 Ill. 2d at 365; see also *People v. Fields*, 2014 IL App (1st) 110311, ¶ 49; *People v. McFadden*, 2014 IL App (1st) 102939, ¶ 34, *pet. for leave to appeal allowed*, No. 117424 (May 28, 2014) (applying *Blair* where the case was pending at the time *Blair* was decided). As defendant committed this offense on March 24, 2009, after the enhancement was revived, the trial court properly applied it to his sentence.

¶ 146                    F. Improper Consideration Of Pending Charges In Sentencing

¶ 147    Defendant's final argument is that the trial court improperly considered charges pending against him as aggravating factors increasing his sentence. The State responds that the trial court did not consider any improper factors; it considered the pending charges as evidence of defendant's tendency to recidivate, which is a proper factor in aggravation. For the reasons stated below, we agree with defendant.

¶ 148    We review a sentence that falls within statutory limits for an abuse of discretion. *People v. Jones*, 2014 IL App (1st) 120927, ¶ 56. However, when a trial court considers an improper factor in aggravation, the trial court abuses its discretion. *People v. McAfee*, 332 Ill. App. 3d 1091, 1096 (2002).

¶ 149  The trial court may not rely on bare arrests or pending charges in aggravation of a sentence. *People v. Johnson*, 347 Ill. App. 3d 570, 575 (2004). But the court may rely on evidence of a defendant's other criminal activity, even if that conduct has not resulted in a conviction, where the trial court finds the evidence to be relevant and accurate. *People v. La Pointe*, 88 Ill. 2d 482, 498-99 (1981). A mere list of arrests or charges in a presentence report, unsupported by live testimony or other evidence at the sentencing hearing, does not meet those standards. *People v. Thomas*, 111 Ill. App. 3d 451, 454 (1983); see also *Johnson*, 347 Ill. App. 3d at 576 (trial court impermissibly considered bare fact that defendant had been arrested for a sexual assault in Arkansas); *People v. Wallace*, 145 Ill. App. 3d 247, 256 (1986) (trial court improperly considered pending rape charge as aggravating factor).

¶ 150  In this case, the trial court erred in considering defendant's pending possession of contraband and aggravated battery charges as aggravating factors. The presentence investigation report showed that defendant had been charged with possession of contraband and aggravated battery of a peace officer while he was in custody awaiting trial in this case. At defendant's sentencing hearing, the State presented no evidence relating to these charges, but argued that they showed that defendant had "decided to conduct further acts of violence." In discussing the aggravating factors applicable to defendant, the court cited the two charges listed in the presentence report. Then, the court found that defendant had "continued" to commit crimes, citing his two pending charges and saying that they "do[ ] not go well for him." Clearly, the trial court considered the bare fact that defendant had been charged with two offenses while in custody as an aggravating factor.

¶ 151  The State claims that the trial court did not consider defendant's charges as an aggravating factor; instead, the trial court considered the likelihood that defendant would recidivate, as

evidenced by the fact that he had been charged with two new offenses. That distinction is meaningless. In order to find that defendant was likely to commit more offenses based upon his pending charges, the trial court necessarily had to assume that defendant actually committed those unproven offenses. Yet the trial court heard no evidence at the sentencing hearing from which he could determine whether defendant actually committed a battery or possessed contraband in jail. The reason that bare charges—as opposed to convictions—should not be considered is that the underlying facts have not yet been proven. *People v. Gaines*, 21 Ill. App. 3d 839, 846 (1974). Here, the trial court had no basis upon which to decide whether defendant actually committed the offenses the State claimed he had committed. Thus, the trial court improperly relied on the mere fact that defendant had been charged with those offenses to aggravate his sentence.

¶ 152   The State cites *People v. Hunzicker*, 308 Ill. App. 3d 961, 966 (1999), to support its distinction, but the defendant in that case did not argue that the trial court improperly considered pending charges. Rather, he argued that, generally, his sentence was excessive. *Id.* Thus, although the trial court considered the defendant's arrest while on bond as aggravating evidence, the appellate court was not specifically asked to decide whether that consideration was improper and did not do so. *Id.* at 963, 966; see also *People v. Givens*, 237 Ill. 2d 311, 323 (2010) (appellate court should not consider unraised and unbriefed issues in order to reverse judgment). We do not read *Hunzicker* as broadly as the State, particularly when such a reading of that decision would conflict with well-established precedent on this issue. See *Johnson*, 347 Ill. App. 3d at 575; *People v. Gomez*, 247 Ill. App. 3d 68, 73-74 (1993); *Wallace*, 145 Ill. App. 3d at 256; *Thomas*, 111 Ill. App. 3d at 454.

¶ 153   We must still consider what effect, if any, the trial court's error had on defendant's sentence. Where a trial court considers an improper factor in aggravation, we must order

resentencing if we cannot determine the weight that the trial court gave to the aggravating factor. *McAfee*, 332 Ill. App. 3d at 1096-97. Conversely, where the trial court appears to place minimal emphasis upon an improper factor, a new sentencing hearing is not required. *E.g.*, *Gomez*, 247 Ill. App. 3d at 74 (declining to order resentencing where trial court simply mentioned defendant's arrests in passing).

¶ 154    Here, the trial court sentenced defendant to 23 years' incarceration, two years above the statutory minimum. The only aggravating factors the trial court considered, other than defendant's two pending charges, was an adjudication of delinquency for battery entered when defendant was 16 and the fact that defendant had threatened to "shoot *** up" the victim's house if he told the police about the robbery. The fact that the trial court found relatively few aggravating factors applicable to defendant suggests that the pending charges may have played a role in increasing his sentence. Moreover, the trial court twice noted that defendant faced pending charges and stated that those charges did not "go well for" defendant. The repetition of the improper factor, coupled with the fact that the trial court also said that the charges reflected negatively on defendant, leads us to conclude that the charges likely played more than a minimal role in defendant's sentencing. Consequently, we vacate defendant's sentence and remand for resentencing.

¶ 155                                    III. CONCLUSION

¶ 156    For the reasons stated above, we affirm defendant's conviction but vacate his sentence and remand for resentencing. Defendant was not denied his right to present a defense. He was not deprived of a fair trial by virtue of the jury seeing his tattoos. While the trial court erred in making improper comments and inconsistent rulings during closing arguments, defendant has not established that those errors were plain errors. Defendant's constitutional and voidness challenges to his sentence are foreclosed by recent Illinois Supreme Court decisions. However, defendant is

entitled to be resentenced because the trial court improperly considered charges pending against him at the time he was sentenced.

¶ 157 Conviction affirmed; sentence vacated; remanded for resentencing.

¶ 158 JUSTICE COBBS, dissenting.

¶ 159 I respectfully dissent. One of the most fundamental principles of our criminal justice system has been overlooked in the majority's disposition of this case. "A criminal defendant, whether guilty or innocent, is entitled to a fair, orderly, and impartial trial conducted according to law." *People v. Bull*, 185 Ill. 2d 179, 214 (1998). Here, the majority identifies a number of significant trial errors but, nonetheless, concludes that defendant was not denied a fair trial.

¶ 160 Our supreme court has admonished that when a defendant alleges that his due process rights have been compromised, prejudice to the defendant's case is not the sole issue on review. See *People v. Blue*, 189 Ill. 2d 99 (2000). Rather, we must also consider "whether a substantial right has been affected to such a degree that we cannot confidently state that defendant's trial was fundamentally fair." *Id.* at 138 (citing 134 Ill. 2d R. 615(a)). Even if I could conclude that the trial court's errors, taken individually, did not warrant reversal, mindful of our supreme court's admonishment in *Blue*, surely, in this case, the cumulative effect of those errors not only created "a pervasive pattern of unfair prejudice to defendant's case," but ultimately deprived him of his right to a fair trial. *Blue*, 189 Ill. 2d at 139.

¶ 161 To begin, defendant asserts four separate trial court errors in support of his claim that he was denied due process. Of the four errors, the majority finds that three have merit. I agree. The majority attempts to diminish the severity of these three errors by concluding that either the errors had minimal effect on defendant's presentation of his defense or that, regardless of the errors, the evidence against him was overwhelming. I disagree.

¶ 162  First, the majority concludes that the trial court erred in sustaining the State's objection and excluding, as hearsay, defendant's testimony that Detective Escalante and Assistant State's Attorney Berg made coercive statements to him.  The majority additionally concludes that the trial court erred in sustaining the State's objection and excluding, as hearsay, defendant's testimony that ASA Berg refused to accept his assertions that Breed, his co-offender, did not have a gun. The majority finds that because the evidence was overwhelming, defendant was not prejudiced, and thus, the errors were harmless beyond a reasonable doubt.

¶ 163  The "overwhelming" evidence in this case consists, in sum, of the victim's testimony regarding the offense which, he averred, included the offenders' use of a gun — a version which differed from the version recounted first to his mother, in which he did not mention a gun, and was disputed by defendant;  Escalante's testimony concerning his investigation of the offense — testimony which included his statement that he did not locate the gun allegedly used by Breed in the commission of the offense; and, defendant's signed written confession — a confession drafted by ASA Berg, who was not available to testify at trial, but who had testified at the suppression hearing that she did not read the statement to defendant prior to him signing it.  Defendant's testimony, which also counts as evidence, was to the effect that no gun was used in the commission of the offense; that he signed the confession without having fully read it, under threat of additional robbery charges; and, that he told Escalante that no gun had been used and provided Escalante with identifying address information for Breed, the alleged gunman. If we may discount the erroneously excluded evidence, then yes, as the majority concludes, the evidence here might be considered overwhelming.  Therein, however, lies the problem — the trial court's erroneous exclusion of defendant's admissible evidence, which happens to challenge the State's evidence, and which also happens to support defendant's theory of the case.

¶ 164    The majority further concludes that defendant's trial testimony, though not implausible, would not have significantly undermined the strength of the State's evidence.    The State's evidence consisted of the victim's testimony — testimony which was disputed by defendant; Escalante's testimony — testimony in which he stated that ASA Berg had read the confession to defendant, when in fact, ASA Berg's own testimony was to the contrary; and, the confession itself — a document based on ASA Berg's interview with the 16 year old defendant, which commenced at about 2:00 a.m. in the morning, consisting of five (5) handwritten pages (even though recording equipment was readily available in the interview room) and, which defendant averred was an inaccurate product of coercive conduct.    Whether defendant's testimony would have been fatally undermined by the State's evidence depended entirely on a credibility determination.    A matter, which we understand, rests within the province of the jury.

¶ 165    Finally, the majority concludes that the evidence at issue was cumulative because defendant was ultimately allowed to testify that his statement was coerced.    The cumulative evidence consists of two statements during the course of defendant's testimony: One —"[b]ecause, like the reason I said earlier, I didn't want to get charged with any more charges that I had nothing to do with at all." And two — "[b]ecause I didn't want to get charged with any more cases."    The majority finds support for its reasoning with reliance on *People v. Seesengood*, 266 Ill. App. 3d 351, 358-59 (1994).

¶ 166    In *Seesengood*, the court found that the evidence which had been erroneously excluded in that case cumulative because the "[d]efendant <u>fully</u> communicated to the jury the substance of his alleged hearsay conversation, as well as its effect on his allegedly innocent state of mind." (Emphasis added.)    *Id.* at 359.    I am hard-pressed to conclude that the brief testimony permitted in this case fully communicated to the jury the substance of defendant's conversations with either

Escalante or with ASA Berg, much less its effect on his state of mind. Moreover, as the majority notes, with respect to the excluded testimony regarding defendant's statements to ASA Berg, the court not only sustained the objection but, advised the jury to disregard the testimony as hearsay. Further, even if the permitted testimony could be perceived as adequate to convey defendant's claims of coercion, that testimony did nothing to address his additional claims that the confession contained allegedly false information. Finally, I would note that the alleged hearsay testimony was immediately preceded by a number of sustained objections as defense counsel vainly attempted to elicit defendant's testimony to support his claim of coercion. We presume, as we must, that the jury properly performed its duty and disregarded it.

¶ 167 Defendant's testimony was apparently the only evidence to support his theory of the case. The majority correctly concludes that the trial court improperly sustained each of the State's objections to his testimony on the statements of Escalante and Berg as hearsay. The error is further exacerbated when, in a sidebar concerning the admissibility of defendant's testimony, defense counsel comments on alleged threats made by Escalante and the court responds, "the fact that there are these threats, this is the first time that I am hearing about this. It never came out, and it is hearsay evidence." Clearly, the trial court's error infringed on defendant's right to present his defense; so substantial a right such that our courts find it cognizable as plain error even if not properly preserved. See *People v. Bean*, 137 Ill. 2d 65, 80-81 (1990). In my view, these errors alone constituted reversible error.

¶ 168 Additionally, the trial court's error in limiting defendant's cross examination of the victim regarding whether he had a motive to lie about the involvement of a gun, coupled with the court's failure to give defendant's requested proper jury instruction pertaining to his incriminating statement, also casts doubt upon the reliability of defendant's conviction. See *Blue*, 189 Ill. 2d at

138. The majority focuses heavily on the weight of the State's evidence against defendant in disposing of these issues, but regardless of the strength of the evidence, the law requires that defendant be given an opportunity to present his version of the facts and to challenge the State's evidence against him. See *People v. Caffey*, 205 Ill. 2d 52, 90 (2001) (analyzing defendant's right to present a defense claim under the second prong of the plain error doctrine due to the importance of the right involved)); See also *People v. Manion*, 67 Ill. 2d 564, 576 (1977) (quoting *Washington v. Texas,* 388 U.S. 14, 19, 87 (1967)) (holding that "an accused has the right to present a defense, the right to present the defendant's version of events as well as the prosecution's to the jury so it may decide where the truth lies")). However, in this case, the jury was permitted to hear the State's theory of the case, while defendant was considerably limited in his attempts to respond to the charges against him.

¶ 169   Further, although the wording of IPI 3.06-3.07 and IPI 3.11 is in some ways similar, the wording and the purpose of the two instructions are, in fact, different.   As the majority notes, the trial court gave only a portion of IPI 3.11, the portion which includes the following text:   "[Y]ou may consider a witness's earlier inconsistent statement as evidence *without this limitation* when ***."  (Emphasis added.)   IPI Criminal 4th No. 3.11.   Having given a portion of IPI 3.11, the text "*without this limitation*" is left unexplained, and makes no sense in the context of the cobbled together version given by the trial court.   Yet, the majority concludes that defendant cannot show any serious risk that the jury misunderstood the law because the court gave a nearly identical instruction to IPI 3.06-3.07.

¶ 170   I would note additionally, that the court in *People v. Johnson*, 385 Ill. App. 3d 585 (2008), a case upon which the majority relies for its harmless error finding, held that the error in the court's failure to give the correct jury instruction there was harmless because in that case, with the

exception of including the word "earlier," the given and requested instructions were similar. Significantly, in *Johnson*, the defendant's confession was videotaped and played to the jury. Thus, the majority expressed that the jury was able to make the connection between the "prior inconsistent statement" (IPI Criminal 4th No. 3.11 language) and the defendant as a "witness" (IPI Criminal 4th No. 3.11 language). No such video recording of this defendant's confession was available to ensure that the jury made the proper connection in this case. In the face of the trial court's erroneous rulings concerning the admissibility of the evidence on coercion, including the court's acknowledgement that it was not aware of threats made to induce the confession, the jury instruction error serves as one more error in a series of others which compromised defendant's due process rights to a fair trial.

¶ 171 Defendant next asserts three separate claims of error with respect to the trial court's rulings regarding his tattoos. The majority finds error with respect to two of the three claims, but nonetheless, finds the errors harmless beyond a reasonable doubt. I disagree.

¶ 172 Defendant first claims error in the trial court's denial of his pretrial motion to conceal his facial tattoos with flesh-toned makeup. The majority establishes that the standard of review of this claimed error is abuse of discretion and I have no cause to disagree. Whether the trial judge properly exercised his discretion in ruling on defendant's motion, however, is another matter. In any case, I agree with the majority that general regulation of a defendant's appearance is within the discretion of the trial court. Unlike the majority, however, I disagree that either *Jackson v. United States*, 945 A. 2d 621 (D.C. Ct. App. 2008), or *State v. Ross*, 115 So. 3d 616 (La. Ct. App. 2013), or *State v. Ortiz*, 300 P. 3d 786 (Utah Ct. App. 2013) provide any support for the trial court's denial of defendant's motion to conceal. The majority notes that in *Jackson* and *Ross* the court denied defendant's request to conceal his tattoo with makeup because witnesses relied on the tattoos for

identification purposes. I note additionally the *Jackson* court's holding that even if the court improperly precluded the defendant from concealing his teardrop tattoo, it was "almost certain" that he was not prejudiced because the outcome of the trial strongly indicated that the jury accepted the defendant's testimony regarding the mitigating circumstances in his case. *Jackson*, 945 A. 2d at 628. Additionally, the majority notes that the *Ortiz* court upheld the trial court's denial of defendant's request to cover his facial tattoo because they were simply part of his general appearance and neither the State nor any of the witnesses referred to the tattoos during trial. However, the majority fails to mention that the jurors in *Ortiz* "were specifically asked whether the facial tattoos would affect their ability to be fair and impartial and none of the jurors indicated that they would." *Ortiz*, 300 P. 3d 786, n 2.

¶ 173    I gather from these cases that a denial of a motion to cover a defendant's tattoos, while in the discretion of the trial court, is most proper when the defendant's tattoos serve a relevant purpose, such as identification, or where facts support the conclusion that the appearance of a defendant's tattoos had no influence on the jury's verdict. In this case, defendant's facial tattoos served no relevant purpose and there is no way to determine whether the tattoos adversely affected the jury's perception of defendant.

¶ 174    It appears from the record that defendant, at the age of 16, was arrested for the commission of this offense.   At some time during pretrial incarceration, defendant elected to tattoo parts of his flesh.   Apparently, during *voir dire*, defendant, without approval from the court, concealed the tattoos with flesh-toned makeup.   The court, once made aware, commented that he did not notice that defendant had on makeup.   A request for approval from the court to conceal the tattoos prior to trial was met with the following colloquy:

>                "MS. SNEED [DEFENSE COUNSEL]:   Judge, at this time I am asking that the

Court to allow the public defender's office to apply makeup to Marlon Minter's face in order to conceal the tattoos. The makeup, as you see, is flesh tone. It does not change the color of his face. It will just help to conceal the tattoo that he has up above his right eye, which is initials I-K-E, and also the tattoo above his left eye of A-T-G, along with a spider web. And then there is a teardrop dripping from his right eye, teardrop dripping from his left eye, two teardrops dripping from his chin next to his - - to the right side of his mouth. * * * And, Judge, we think that it would be prejudicial if the jury were allowed to view those tattoos because the jury would have a preconceived notion about the defendant upon viewing those tattoos.

THE COURT: Well, Ms. Sneed, I understand what you are saying. But who created that condition?

MS. SNEED: He did create the condition, however, and he is not trying to – it won't conceal how he looked when he was arrested because when he was arrested he did not have these tattoos.

THE COURT: Okay. So he has willfully changed his appearance while he was in custody, is that what you are telling me.

MS. SNEED: Well, his appearance has changed, yes Judge. But by the same token, I believe the prejudicial nature of the tattoos, people have preconceived notions about people with tattoos, especially when they have teardrops. * * * And I think that it is very little for the Court to do to allow us to apply makeup. He wore makeup yesterday, and __

THE COURT: Because I wasn't aware of it. I mean, and you guys did it without getting my permission.

MS SNEED:   We didn't know that we had to have permission, Judge.

THE COURT:   Well, what you are doing is changing – you are bringing contraband, stuff into the court system without my permission.

* * *

MR. D'ANGELO [ASSISTANT STATE'S ATTORNEY]:    * * * He is the one who made himself look like this. * * *   His appearance should not be camouflaged.   The defendant has done this, and the jury has the right to see it.    * * *

MS. SNEED:   Judge, when people see gang – they associate teardrops with gang tattoos.   They don't know what those tattoos necessarily mean, but they attach meaning to it themselves, whatever those meanings are.

MR. D'ANGELO: * * * If you are so concerned that * * * the jury is going to be confused by what the defendant has done to himself * * * put him on the stand and let him explain it to the trier of fact.   That's his opportunity.

* * *

THE COURT:   Motion is denied.

* * *

I don't even see the tattoos from here.   So you are making a mountain out of a mole hill.   If that's how he looks, that's how he looks.   I am not going to allow him to put anything on his face that's not how he naturally looks.

* * *

MS. SNEED:   When he was arrested for this case, *** he did not have tattoos.

THE COURT:   So what?   He changed his appearance while he was in custody.   I didn't change it.   You didn't change it.   The State didn't change it.   He chose to change it

himself. That's the way that he is going to appear. The motion is denied. All right."

¶ 175 The circuit court is charged with the responsibility of ensuring that all defendants receive a fair trial, (*People v. Emerson*, 189 Ill. 2d 436, 485 (2000)), not the defendant. As the majority acknowledges, there is little case law to guide us. However, the guidance found lacking is not necessary for resolution of this issue in this case. That is so because I see no suggestion that the court properly considered defense counsel's argument with respect to the prejudicial effect of defendant's appearance, or that the court on its own considered possible prejudice. Instead, the court's focus centered largely on the fact that the defendant had, of his own volition, altered his appearance. To find no abuse of discretion requires that there have been a proper exercise of that discretion. Because I believe that the trial court failed to consider the prejudicial effect of the defendant's tattoos, or how the State would have been prejudiced by permitting the tattoos to be concealed, as deferential as the standard is, on the facts of this case, I would find that the court abused its discretion. See, *e.g., People v. Houser*, 305 Ill. App. 3d 384, 390-392.

¶ 176 By no means do I sanction defense counsel's prior concealment of defendant's tattoos absent the court's approval. However, it occurs to me that the non-visible appearance of defendant's tattoos during *voir dire* and then the visible appearance of the tattoos during trial might actually have been more confusing to the jury. Confusion, not to mention possible prejudice, which should have been considered by the trial court.

¶ 177 The majority next concludes that the trial court erred when it allowed the State to cross-examine defendant about his non-visible tattoos. Yet, the majority finds that the error was harmless, reasoning that his tattoos did not carry any obvious negative connotation and the State did not attempt to draw any negative inferences from any of the tattoos. I disagree. Defense counsel objected to the line of the questioning by the State regarding the non-visible tattoos as

beyond the scope of direct examination. Interestingly, earlier at trial, during defense counsel's cross-examination of the victim concerning his observations of the offenders, the State, in explaining the basis of its objection to defense counsel's questioning, offered that "[c]ross–examination is limited to the direct examination." I believe that each of the trial court's rulings regarding defendant's tattoos contributed to the denial of defendant's due process right to a fair trial.

¶ 178 In my opinion, the majority fails to sufficiently address defendant's contention that the State's irrelevant inquiry, over defense counsel's several objections, may have improperly influenced the jury's perception of him. Instead, the majority seemingly dismisses the real possibility that the State's improper action had any effect on the jury, noting that the State does not introduce any evidence to suggest defendant's gang involvement. However, I am not convinced, given the overall tenor of the trial proceedings, that the State's action was as harmless as the majority concludes. Although the State did not explicitly question defendant regarding whether he was involved in a gang, the implication was present, most notably through the State's attempt to elicit the meaning of defendant's "chief" tattoo, which yielded no positive explanation and thus, could have been negatively perceived by the jury.

¶ 179 Although the majority finds that the State's inquiry into defendant's non-visible tattoos was improper, it nonetheless concludes that the trial court did not abuse its discretion in denying defendant's request for a cautionary jury instruction. In so concluding, the majority reasons that defendant testified that his tattoos had innocuous meanings. Defendant argues, and I agree, that the appearance of the tattoos themselves gives rise to the potential for prejudice, regardless of the meaning that defendant attempted to ascribe to them. The trial court could have easily ensured that that tattoos, both visible and non-visible, would not have any bearing on the jury's decision by

simply issuing a jury instruction. The court instead rejected defendant's request with no apparent reasoning.

¶ 180   The majority rejects defendant's reliance on *People v. Newsom*, 452 F. 3d 593 (6th Cir. 2006).   In *Newsom*, the reviewing court found that the trial court's error in admitting defendant's irrelevant tattoos as evidence was cured by the trial court's subsequent instruction to the jury not to consider the tattoos in reaching its decision. The majority finds the instant case distinguishable from *Newsom*, concluding that this case did not involve the admission of any prejudicial tattoo evidence.

¶ 181   Although the discussion in *Newsom* indicated that the content of the defendant's tattoos was unfairly prejudicial, and indeed it was, the court's finding of error was not based on the content of the tattoos, but instead on the fact that any probative value of the tattoo evidence was outweighed by the possible prejudicial effect.   *Id.* at 603.   Here, although defendant's explanation of the content of many of his tattoos was positive, the State's, further, improper questioning concerning the "Chief" tattoo was not responded to with any positive explanation. Defendant's tattoos were not being offered by the defense as evidence, but instead, to diminish any possible prejudice.   Clearly, the State's improper inquiry was for a different purpose.   Given that the motion to conceal was denied, and that the defense's testimony regarding the tattoos was not offered as any substantive evidence regarding the offense, the prejudicial effect of the State's cross-examination required for its cure an instruction to ensure that the jury's verdict would not rest on considerations other than the evidence alone. See *Blue*, 189 Ill. 2d at 140.

¶ 182   Unfortunately, error in this case was not confined to the evidentiary phase of this trial. The majority also finds that the trial court abused its discretion during closing argument. Specifically, the majority finds error in that the court misconstrued Escalante's testimony and then

argued with defense counsel about the testimony. Additionally, the court strictly limited defense counsel's argument but allowed the State considerable leeway in drawing reasonable inferences from the evidence. However, the majority concludes that defendant forfeited review of this issue because it was not properly preserved. In my view, because the trial court's actions during closing arguments affected defendant's substantial right to a fair and impartial trial, I believe that his claim is properly reviewable under the second prong of the plain error doctrine. *People v. Herron*, 215 Ill. 2d 167, 187 (2005). The trial court's seeming partiality during the final arguments had the potential to leave a lasting impression on the jury. See *Lewerenz*, 24 Ill. 2d at 301 (stating that "jurors are quick to perceive any leaning of the court and place great reliance upon what he says and does, so that his statements and intimations are liable to have the force of evidence and be most damaging to an accused"). Further, a number of the court's comments and rulings throughout the entire course of the proceedings evidenced a hostile disposition toward defendant and ultimately contributed to the denial of his right to a fair and impartial trial. Suffice it to say that "[t]he atmosphere in and around the courtroom might be so hostile as to interfere with the trial process, even though an examination of the record conformed to the requirements of law: the defendant had counsel, the jury members stated they were impartial, the jury was correctly charged, and the evidence was legally sufficient to convict." *Estes v. Texas*, 381 U.S. 532, 561 (1965) (quoting *Moore v. Dempsey*, 261 U.S. 86-90, (1923)).

¶ 183 The majority identifies a number of significant trial court errors and improper comments. In that regard, I note finally that the majority's decision to vacate defendant's sentence is based on yet another improper comment from the trial court regarding defendant's pending charges. "Each of the errors *** in and of themselves, cast doubt upon the reliability of the judicial process." *Blue*, 189 Ill. 2d at 139. Yet, the majority finds no denial of due process. I disagree. In this case, the

cumulative effect of the trial court's errors created a "synergistic effect" on defendant's trial which necessitates a reversal of his conviction and remand for a new trial. *Id.* at 138.