NOTICE

Decision filed 02/18/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 230475-U

NO. 5-23-0475

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Franklin County. |
| | ) | |
| v. | ) | No. 21-CF-140 |
| | ) | |
| HEATH M. DUNNING, | ) | Honorable |
| | ) | Thomas J. Tedeschi, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE CATES delivered the judgment of the court.
Justices Moore and Sholar concurred in the judgment.

**ORDER**

¶ 1    *Held*: The defendant's conviction is affirmed as the defendant received effective assistance of counsel. The circuit court lacked jurisdiction to hear the defendant's posttrial ineffective assistance of counsel claim. The circuit court improperly considered pending charges against the defendant during sentencing while the evidence was closely balanced.

¶ 2    Following a jury trial, the defendant, Heath M. Dunning, was found guilty of first degree murder and unlawful possession of a weapon by a felon and sentenced to 48 years in the Illinois Department of Corrections (IDOC) and 6 years in IDOC, respectively. At his trial, the defendant did not deny stabbing and killing Dennis L. Martin. Instead, the defendant argued that he acted under the unreasonable belief that self-defense was justified, therefore, he was only guilty of second-degree murder. On appeal, the defendant raises three issues. The defendant first contends that he received ineffective assistance of counsel because defense counsel failed to (1) advance the

1

theory that the defendant's intoxication contributed to his unreasonable belief that he was justified in using self-defense, and (2) request that the full video of the defendant's interrogation be played at trial, which contained exculpatory evidence. The defendant's second argument is that the case should be remanded because the circuit court failed to conduct an inquiry into the defendant's *pro se* posttrial allegation of ineffective assistance of counsel, as required by *People v. Krankel*, 102 Ill. 2d 181 (1984). The defendant's final contention is that the cause should be remanded for a new sentencing hearing because the circuit court improperly relied on several pending cases in aggravation without any evidence that showed their reliability, which deprived the defendant of a fair sentencing hearing. For the following reasons, we affirm the defendant's conviction, vacate the circuit court's sentencing order, and remand for further proceedings.

¶ 3                                    I. BACKGROUND

¶ 4     The defendant was charged by information with first degree murder. The State alleged in the information that the defendant, with the intent to kill or do great bodily harm to Dennis L. Martin, knowingly and without lawful justification caused the death of Martin when the defendant stabbed Martin in the chest with a knife. Subsequently, the State filed an amended information that charged the defendant with three offenses in addition to the original first degree murder charge. The additional charges included first degree murder where the defendant knowingly and without lawful justification caused the death of Dennis L. Martin, in that the defendant stabbed Martin in the chest with a knife knowing such an act created a strong probability of death or great bodily harm (count II), unlawful possession of weapons by felon where the defendant knowingly possessed on his person a knife with a blade in excess of three inches in length (count III), and unlawful restraint where the defendant knowingly and without legal authority detained Dennis L. Martin (count IV).

2

¶ 5                                    A. Pretrial Proceedings

¶ 6      The defendant filed a motion to suppress statements made during the interview following his arrest. On April 15, 2021, the Franklin County Sheriff's Department transported the defendant from the scene of the offense to an interview room located in the Franklin County jail. After the defendant arrived at the interview room, he was joined by Lieutenant Richard Minton and Detective Amy Spotanski-Tipton. Detective Spotanski-Tipton advised the defendant of his *Miranda*[1] rights twice, but the defendant indicated that he did not understand. Subsequently, Lieutenant Minton informed the defendant of his *Miranda* rights a third time. Following the third advisement, the officers proceeded to interview the defendant. In his motion to suppress statements, the defendant argued that the defendant did not knowingly and intelligently waive his *Miranda* rights.

¶ 7      On November 12, 2021, the circuit court held a hearing on the defendant's motion to suppress statements. At the suppression hearing, the defendant argued that because Lieutenant Minton provided an inaccurate explanation of one of the *Miranda* rights, the circuit court should suppress all the defendant's statements following the third advisement. On November 16, 2021, the circuit court entered an order that found that the defendant understood his *Miranda* rights after the third advisement and the defendant voluntarily and intelligently waived those rights. However, the circuit court also found that Detective Spotanski-Tipton posed a question to the defendant before he made a knowing and voluntary waiver of his *Miranda* rights. As a result, the circuit court redacted a small, approximately three-minute, portion of the recording of the defendant's interview.

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

¶ 8    The section of the defendant's recorded interview that was suppressed contained multiple statements from the defendant. The defendant claimed that prior to Martin's stabbing, Martin had grabbed the defendant and "yanked" the steering wheel. The defendant stated that Martin had tried to "fight for it" and that the defendant had to defend himself. Also shown in the recording, the defendant demonstrated with his hands and body how the car swerved on the road after Martin had yanked the steering wheel. The defendant never requested that the full, unedited video be played for the jury rather than the redacted video.

¶ 9                                B. Trial Proceedings

¶ 10    On March 20, 2023, the jury was selected for the defendant's trial. The following day, the jury trial proceeded. After opening statements from counsel, the circuit court informed the jury of a stipulation that provided on August 21, 2014, the defendant was convicted of a felony offense in Saline County, Illinois.

¶ 11    The State then presented Nicole Geisler as its first witness. Geisler had known Martin for 19 years and was Martin's ex-girlfriend. Geisler testified that on April 15, 2021, the day of Martin's death, between 11 a.m. and 1 p.m., she and Martin met at Little Chapel Church in Harrisburg, Illinois. While at the church, Geisler offered to give Martin a ride to Eldorado, Illinois. Martin accepted Geisler's offer and left his van at the church while he rode with Geisler to Eldorado. Once Geisler and Martin had completed some errands, they began to return to the church. On the way back, Geisler noticed that someone in a gray car was following them. Martin informed Geisler that it was the defendant, whom he had met in prison. Martin said he was going to help the defendant get a job and that Martin needed to get a work shirt from his apartment for the defendant.

4

¶ 12    When both cars arrived at the church, the defendant parked his car and got into the driver's seat of Martin's work van. Martin joined the defendant in the van for a moment but returned to Geisler's car. Geisler needed to pay for her car insurance in Thompsonville, Illinois, so both cars departed the church parking lot and began driving towards Thompsonville. During the drive, Martin directed Geisler to pull over, so he could speak to the defendant. Later, Martin had Geisler pull over a second time, but this time Martin kissed Geisler and told her to go home. Martin then went into the van with the defendant.

¶ 13    Later that night, around 7 p.m., Martin called Geisler and told her that he was on his way home. Geisler received a second phone call from Martin between 7 p.m. and 8 p.m. Geisler indicated that the second phone call seemed to be an accident and testified that she could only hear "scuffling" in the background.

¶ 14    Julia Neely-Spain testified next for the State. Neely-Spain testified that she had hired Martin as a general contractor to work on her home. Neely-Spain had a contract with Martin where she would pay Martin $500 every second Saturday of the month for Martin's work on her home. Through this arrangement Neely-Spain and Martin became friends. Neely-Spain thought Martin was a pleasant man.

¶ 15    On the night of April 14, 2021, Martin called Neely-Spain to ask if she could pay him the next day, which was ahead of their agreed payment schedule. Martin explained that he really needed the money and that he was scared. Neely-Spain responded that she was not feeling well and could not drive to the bank. The two agreed that if Martin was desperate for the money that he could drive Neely-Spain to the bank, so she could withdraw the money from the bank.

¶ 16    The next day, April 15, 2021, in the late afternoon Marin arrived at Neely-Spain's house with the defendant. The defendant went to the front door to get Neely-Spain, while Martin

5

remained in the backseat of his work van. The defendant had made her feel uncomfortable. Neely-Spain described the defendant as anxious, eager, and unsettled.

¶ 17    As agreed, Neely-Spain went with the two men to the First Financial Bank in West Frankfort, Illinois. At the bank, Neely-Spain withdrew $800 from the ATM. They then left the bank. Before returning to Neely-Spain's home, they stopped at a grocery store. At approximately 7 p.m., they arrived at Neely-Spain's home. After he parked the van, the defendant carried the groceries to the front door while Martin and Neely-Spain spoke in the driveway about money. Once Martin agreed to provide a receipt, Neely-Spain paid Martin $500. Neely-Spain asked Martin if something was wrong. Martin replied that he was okay and instructed Neely-Spain to go inside the house. The defendant and Martin left Neely-Spain's house just before 7:30 p.m.

¶ 18    The State's next witness was Casey Stanley, who was an acquaintance of Martin's. On April 15, 2021, between 6 p.m. and 8 p.m., Martin and the defendant visited Stanley's house unannounced. Martin was looking for Stanley's uncle, but he was not home at the time. Stanley invited the two men inside her home to wait for her uncle. While they were waiting, the defendant took a large knife out of his pocket and began cutting off the frayed ends of his pants. Stanley felt that it was odd that the defendant had such a large knife in his pocket, but she was not threatened.

¶ 19    Later, while at Stanley's house, Martin received a phone call, and he excused himself to take the call outside. Approximately five minutes later, Stanley went outside to check on Martin. Stanley realized that Martin's van was gone, and the defendant was still at Stanley's house. Stanley was uncomfortable being alone with the defendant because she barely knew him. The defendant appeared agitated that Martin had left without him. The defendant then walked off, down the driveway, and turned right onto the roadway. Stanley testified that the two men were only at her house for 15 to 20 minutes.

6

¶ 20    For its next witness, the State called Jaxon Calvert. Calvert had worked for Martin for about a month and was also a volunteer firefighter for Thompsonville, Illinois. Calvert testified that on the evening of April 15, 2021, he had received multiple phone calls from Martin for a ride. Martin was at a bar and was driving around with another man. The third or fourth phone call from Martin lasted for a couple of minutes. Calvert heard a loud argument about who should drive. Martin had wanted to drive the van. Calvert thought that Martin sounded nervous. In addition to the argument, Calvert heard someone being punched. Calvert then heard Martin say, "stop hitting me," but the sound of punching continued. Right before the call ended, Calvert heard a "big blow."

¶ 21    Shortly after the call ended, Calvert was notified that the fire department needed to respond to an emergency. Calvert responded as directed. When he arrived at the scene of the emergency, he saw Martin's motionless body on the ground by the passenger back door of a van. Calvert informed his chief that the body may be Martin, Calvert's boss. Calvert also disclosed what he had heard during the recent phone calls with Martin.

¶ 22    The State next called Miranda Harris. Harris lived in West Frankfort, Illinois, near where Martin's body was located. Just after dark on April 15, 2021, Harris had just returned home from work and took her dog outside. While she was outside with her dog, she observed a white minivan that swerved in the road. The van pulled over across the street from Harris, into the driveway of her neighbor, Roy Duke. The driver, who Harris identified as the defendant, got out of the van and ran up to the Dukes' door saying to "call 911." The defendant then returned to the van. Harris crossed the street to retrieve her dog, and she heard the defendant say, "I stabbed him. I didn't mean to." Harris also heard the defendant say, "I stabbed him because he attacked me." Harris noticed that the defendant had a knife in his hand. In the process of collecting her dog, Harris

7

observed a man lying on the ground outside the van. Harris kneeled down to check on the man and believed that he could not be revived. Harris returned to her home and called 911.

¶ 23 Roy Duke, the owner of the property where Martin's body was found, took the stand next for the State. On April 15, 2021, Duke was alerted by his wife to people fighting and arguing in the front yard. Duke responded to the front door and saw a man, who he could not identify, "beating on the door" and turning the doorknob trying to get into the house. The man also asked for someone to help him. Duke told the man to get away from the house and get off his porch. The man left but later came back up to the house again. The man was rubbing his head, and he looked like he was lost and he was not sure what to do. Duke saw the man try to help the other man on the ground. Duke could tell that the man lying on the ground had already passed away.

¶ 24 Michael Fraulini, who was a dispatcher for the city of West Frankfort, Illinois, then testified for the State. As a dispatcher, 911 calls, including police, fire, and EMS, were routed through Fraulini. Fraulini testified that on April 15, 2021, around 8:30 p.m., he received a 911 call from a man, who identified himself as Heath Dunning. The man reported that he stabbed another man who tried to take his keys. During the 911 call, Fraulini noticed that the caller sounded panicked and heard him breathing heavily. After the call ended, Fraulini received three more calls from the same number "Heath Dunning" had called from. All the calls that Fraulini received through the 911 system were recorded. Those recordings were played for the jury.

¶ 25 The State's next witness was Captain Kevin Roye of the Franklin County Sheriff's Office. Captain Roye was one of the officers who responded to the scene of the incident. When Captain Roye arrived on the scene, he observed a white van parked with the driver's door and the passenger, side panel door both open. There were two people on the passenger side of the van. One man, later identified as Martin, was lying motionless on his back. The other man, later identified

as the defendant, was knelt on one knee beside the man on the ground. Captain Roye approached the two men and saw that Martin was unresponsive. Captain Roye then tried to handcuff the defendant but was unable to for some time because the defendant was in an "excited state." The defendant was jumping around and yelling. Captain Roye was eventually able to handcuff the defendant and placed him in the backseat of the squad car.

¶ 26    The State also called Marty Leffler, the Franklin County Coroner, to testify. Leffler was present for Martin's autopsy, which was conducted by Dr. John Heidingsfelder. Prior to the trial, Dr. Heidingsfelder passed away. Leffler testified regarding Dr. Heidingsfelder's autopsy report. Dr. Heidingsfelder had concluded that Martin's cause of death was "hemopericardium, left hemothorax due to fenestration of the heart, due to a stab wound to the chest." The manner of death was a homicide. Leffler also testified that Martin's toxicology results showed that his blood was positive for ethanol in the amount of 0.045, which was below the legal limit. The toxicology results also showed a presence of marijuana in Martin's system.

¶ 27    Detective Amy Spotanski-Tipton of the Franklin County Sheriff's Office also testified for the State. Detective Spotanski-Tipton was not on duty on April 15, 2021, but her supervisor called her at approximately 9 p.m. to respond to the Dukes' residence. When Detective Spotanski-Tipton first arrived at the scene, she observed a white van parked in front of the Dukes' residence and Martin's body was on the south side of the van. Detective Spotanski-Tipton also saw a hunting knife at the scene, which was collected by a crime scene investigator.

¶ 28    Later that evening, at approximately 10:24 p.m., Detective Spotanski-Tipton and Lieutenant Minton interviewed the defendant at the Franklin County Sheriff's Department. During the interview, the defendant said that he was driving Martin's van and that he wanted to go back to his car in Harrisburg. As the defendant was driving towards Harrisburg, Martin pulled the

9

steering wheel and tried to take the key out of the ignition. Martin also "jumped on" the defendant while he was driving. The defendant said that is when he stabbed Martin in the shoulder area. A redacted video recording of the defendant's interview was played for the jury.

¶ 29   The defendant was "booked" into custody at the conclusion of the interview. During the "booking" process, Detective Spotanski-Tipton noticed only one small injury, a small, one-inch scratch on the defendant's left wrist. Detective Spotanski-Tipton testified that she did not observe any indications of physical violence on the defendant's body.

¶ 30   During the subsequent investigation, Detective Spotanski-Tipton discovered that Martin's driver's license was restricted, which prohibited him from driving at night. At the time the stabbing occurred, Martin could not have lawfully operated a motor vehicle. Following the testimony from Detective Spotanski-Tipton, the State rested its case. The defendant did not present any witness testimony or evidence.

¶ 31   After counsel presented closing arguments, the jury left the courtroom to deliberate. During the jury's deliberation, the bailiff received a note from the jury. The jury asked, "What is the definition of a mitigating factor? We understand why a mitigating factor exists. We need clarification on the definition." The State and the defendant agreed that no further instruction was necessary because the jury had already received an instruction regarding a mitigating factor that they decided was "probably adequate." The circuit court directed the jury to continue deliberations and informed the jury they had "received the evidence and instructions of the law." The jury ultimately found the defendant guilty of first degree murder and unlawful possession of a weapon by a felon.

¶ 32   In the months that followed his jury trial, the defendant filed several *pro se* motions. In his motions, the defendant asked the circuit clerk to file an appeal of his conviction that would allow

the defendant to present the events that took place on April 15, 2021. The defendant also claimed that he was not "represented properly" and various rights were violated. The defendant further alleged that the jury was incompetent because it did not understand the difference between first degree and second-degree murder.

¶ 33    On May 17, 2023, a hearing was held where defense counsel informed the circuit court that he would not proceed with the *pro se* motions filed by the defendant. At the next hearing, on June 15, 2023, the court stated that it had reviewed the defendant's *pro se* pleadings. The circuit court noticed that the defendant may have made a claim requesting that the court determine whether his defense counsel should be replaced pursuant to *People v. Krankel*.[2] The defendant responded that he wanted to withdraw all of his motions. The defendant indicated that he was confused, and he was not sure what he was doing. The circuit court verified that the defendant wanted to withdraw his previous claims, and the defendant confirmed that it was his intent to withdraw all of the filed motions.

¶ 34    On the same day, the circuit court proceeded with sentencing. The State argued in aggravation that the defendant had a substantial criminal history and that he committed the instant offense while he was on bond in six other pending felony cases, two violations of probation for felonies, and one being a misdemeanor. The State recommended that the defendant be sentenced to 30 years for first degree murder and 7 years for felon in possession of a weapon, to be served consecutively.

¶ 35    In mitigation, defense counsel argued that the defendant began using drugs while he was a teenager and that he had been hospitalized in a children's asylum for mental health treatment. The defendant also dropped out of school during his sophomore year of high school. Defense counsel

---

[2]*People v. Krankel*, 102 Ill. 2d 181 (1984).

11

also asked the court to consider that the defendant immediately sought help for Martin and admitted that he had killed Martin. Defense counsel noted that the defendant had completed the "Take Action Today's Recovery Education and Re-entry Support Program" while he was awaiting trial. Defense counsel recommended that the defendant be sentenced to 20 years for first degree murder, to be served concurrently with the sentence for felon in possession of a weapon.

¶ 36    Following defense counsel's argument in mitigation, the defendant made a statement in allocution. The defendant apologized to Martin's family and took responsibility for his actions. The defendant said that he never meant for Martin to die, but the defendant was scared and wanted Martin to stop attacking him.

¶ 37    In imposing the defendant's sentence, the circuit court did not find any factors in mitigation. Considering factors in aggravation, the circuit court found that the defendant had a history of criminality and that it was necessary to deter others from committing the same crime. The circuit court acknowledged that the defendant was previously convicted in a 2014 case of aggravated battery involving a knife. The circuit court also acknowledged that the defendant committed murder while out on bond in several pending felony matters, which the court stated was "most troubling." After considering the arguments of counsel and the defendant's statement, the circuit court sentenced the defendant to 48 years for first degree murder, followed by a 3-year term of mandatory supervised release and 6 years for unlawful possession of a weapon by a felon, which would be served consecutively.

¶ 38    On July 3, 2023, the defendant filed another *pro se* motion, entitled "motion to file appeal and vacate the judgment." The motion was identical to the *pro se* motion filed on April 10, 2023, and therefore included the claim that the defendant was not "represented properly." The circuit

12

court did not address the *pro se* motion. Two days later, on July 5, 2023, a notice of appeal was filed. This appeal followed.

¶ 39                                II. ANALYSIS

¶ 40                     A. Ineffective Assistance of Counsel

¶ 41     The defendant contends that he was denied his right to the effective assistance of counsel. The defendant argues that defense counsel was ineffective because counsel failed to advance the theory that the defendant's intoxication contributed to his unreasonable belief that he was justified in using self-defense.

¶ 42     To be successful with a claim of ineffective assistance of counsel, a defendant must allege facts that demonstrate (1) his counsel's performance fell below an objective standard of reasonableness, and (2) there is a reasonable probability that, but for his counsel's errors, the result of the trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 678-88 (1984). The first prong of the *Strickland* test requires the defendant to prove that his counsel's performance fell below an objective standard of reasonableness "under prevailing professional norms." *People v. Colon*, 225 Ill. 2d 125, 135 (2007). Under the second prong, a reasonable probability is defined as a probability sufficient to undermine the confidence in the outcome of the trial, *i.e.*, that the defense counsel's deficient performance rendered the result of the trial unreliable or the proceeding fundamentally unfair. *Strickland*, 466 U.S. at 694. A defendant must satisfy both prongs of the *Strickland* test to establish ineffective assistance. *People v. Albanese*, 104 Ill. 2d 504, 527 (1984).

¶ 43     Counsel's decision regarding which defense theory to pursue is a matter of trial strategy. *People v. Sims*, 374 Ill. App. 3d 231, 267 (2007). It is well established that matters of trial strategy are generally immune from claims of ineffective assistance of counsel. *People v. Smith*, 195 Ill. 2d 179, 188 (2000). A reviewing court will not second-guess counsels trial strategy simply because

13

the defendant was found guilty. *People v. Johnson*, 385 Ill. App. 3d 585, 602 (2008). Further, a reviewing court will give great deference to counsel's judgment and a strong presumption that counsel's conduct falls within the wide range of professional assistance. *Strickland*, 466 U.S. at 689.

¶ 44 In the instant case, we believe that defense counsel chose not to raise the defendant's methamphetamine use the day of the incident to support the second-degree murder defense theory as a matter of trial strategy and judgment. Defense counsel may have decided that emphasizing or highlighting the defendant's use of methamphetamine might have been more damaging than helpful to the defendant's case. As this decision was a matter of trial strategy, it is generally immune to the claim of ineffective assistance of counsel. Therefore, the defendant has failed to meet his burden of establishing that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms.

¶ 45 The defendant also contends that his counsel provided ineffective assistance of counsel where counsel failed to request that the full interrogation video be played at trial. Further, the defendant argues that the full video contained exculpatory evidence that the redacted version published at trial did not.

¶ 46 Counsel's decision of whether to file a motion to suppress is generally a matter of trial strategy. *People v. Shelton*, 2020 IL App (2d) 170453-B, ¶ 16. Reviewing courts will presume that counsel had a legitimate strategy for filing or not filing a motion to suppress. *Shelton*, 2020 IL App (2d) 170453-B, ¶ 16.

¶ 47 Here, defense counsel did file a motion to suppress statements made by the defendant during his interview. Following a hearing on the defendant's motion to suppress, the circuit court redacted three minutes of the interview because the defendant had not yet made a knowing and

14

voluntary waiver of his *Miranda* rights. The recording of the interview was approximately an hour long. In the redacted portion of the interview, the defendant spoke about what happened before Martin was stabbed. The defendant stated that Martin had "yanked" the steering wheel and "tried to fight for it." The defendant also said that he had to defend himself. In the recording shown to the jury, the defendant made similar statements to those that were redacted. The defendant said that he was "scared," that Martin pulled the steering wheel, and that Martin attacked him. Whether to show the additional three minutes of recording to the jury was a matter of trial strategy, which is entitled to great deference. Defense counsel accepted the redacted interview, which was a valid trial strategy given the similar content of both the redacted and non-redacted portions of the interview. We find that the defendant was provided with effective assistance of counsel.

¶ 48                    B. Posttrial Claim of Ineffective Assistance of Counsel

¶ 49    The defendant next argues that this case should be remanded for a preliminary inquiry pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984). The defendant maintains that he filed a *pro se* posttrial motion that alleged he was not "represented properly" by defense counsel, which required the circuit court to conduct an inquiry into the defendant's allegation of ineffective assistance of counsel.

¶ 50    Our supreme court established a procedure through *Krankel* and its progeny that was "intended to promote consideration of *pro se* ineffective assistance claims in the trial court and to limit issues on appeal." *People v. Patrick*, 2011 IL 111666, ¶ 41. When a defendant brings a *pro se* posttrial claim of ineffective assistance of counsel to the circuit court's attention, the defendant triggers a mandatory two step procedure. *People v. Moore*, 207 Ill. 2d 68, 77-79 (2003). The first step requires the circuit court to conduct an inquiry into the underlying factual basis of the defendant's *pro se* posttrial claim of ineffective assistance of counsel. *Moore*, 207 Ill. 2d at 79.

15

Second, if the defendant's allegations show possible neglect, the circuit court should appoint the defendant new counsel. *Moore*, 207 Ill. 2d at 78. The defendant's new counsel would represent the defendant at a hearing regarding the claim of ineffective assistance of counsel. *Moore*, 207 Ill. 2d at 78. However, the circuit court loses jurisdiction of the case once a notice of appeal has been filed and may not address a *Krankel* motion. *Patrick*, 2011 IL 111666, ¶ 39.

¶ 51     In this case, on July 3, 2023, the defendant filed a *pro se* posttrial motion entitled "motion to file appeal and vacate judgment." In the *pro se* motion the defendant requested that the "clerk of the courts *** file an appeal." The defendant also contended that he was not "represented properly." Two days later, on July 5, 2023, the circuit clerk filed a notice of appeal. On the same day, the circuit court appointed the Office of the State Appellate Defender to represent the defendant for purposes of appeal.

¶ 52     It is evident that the circuit court interpreted the defendant's *pro se* posttrial motion as a request for an appeal because two days after its filing the circuit clerk filed a notice of appeal, and the circuit court appointed appellate counsel. As the circuit court understood the defendant's *pro se* posttrial motion to be a request for an appeal, it was without jurisdiction to conduct a preliminary *Krankel* inquiry.

¶ 53     We find that the circuit court did not err when it interpreted the defendant's *pro se* posttrial motion as a request for an appeal. Therefore, upon the filing of the notice of appeal, the circuit court did not have jurisdiction to conduct a preliminary *Krankel* inquiry. As the circuit court was without jurisdiction, it did not err in failing to hold a *Krankel* inquiry on the defendant's ineffective assistance of counsel claim.

¶ 54                                          C. Sentencing

¶ 55    The defendant next argues that this case should be remanded for a new sentencing hearing because the circuit court improperly relied on several pending charges in aggravation without any evidence to show the reliability of the charges, which deprived the defendant of a fair sentencing hearing. As an initial matter, the defendant acknowledges that defense counsel did not object to this issue below and did not file a motion to reconsider sentence. As defense counsel did not properly preserve this issue, the defendant requests that we review the issue under both prongs of the plain-error doctrine.

¶ 56    Under the plain-error doctrine in the sentencing context, a reviewing court may consider forfeited claims where a clear and obvious error occurred and either: "(1) the evidence at the sentencing hearing was closely balanced, or (2) the error was so egregious as to deny the defendant a fair sentencing hearing." *People v. Hillier*, 237 Ill. 2d 539, 545 (2010). To prevail under either prong of plain-error review, the defendant bears the burden of proving actual error. *People v. Mudd*, 2022 IL 126830, ¶ 22. Without an error, there can be no plain error. *People v. Hood*, 2016 IL 118581, ¶ 18.

¶ 57    During sentencing, the circuit court may not rely on bare arrests or pending charges in aggravation of a sentence. *People v. Minter*, 2015 IL App (1st) 120958, ¶ 148. When the circuit court relies on such improper factors, it abuses its discretion. *Minter*, 2015 IL App (1st) 120958, ¶ 148. However, the circuit court may rely on evidence of the defendant's other criminal activity, whether or not it has resulted in a conviction, if the circuit court finds the evidence relevant and accurate. *Minter*, 2015 IL App (1st) 120958, ¶ 148. A list of arrests or charges found in a presentence report, which is unsupported by live testimony or other evidence at the sentencing

17

hearing, does not meet the standards for consideration at sentencing. *Minter*, 2015 IL App (1st) 120958, ¶ 148.

¶ 58 In this case, the circuit court erred when it considered the pending charges against the defendant. At the time of sentencing, the defendant's presentence report reflected there were multiple felony cases and one misdemeanor case pending. The circuit court indicated that it reviewed the presentence report. When discussing factors in aggravation, the circuit court specifically mentioned that the defendant had "several pending felony matters." Immediately after noting the pending felony matters, the circuit court stated, "that [was] most troubling." Clearly, the circuit court erroneously considered the bare fact that the defendant had pending charges as an aggravating factor and placed more than a minimal reference to the charges during sentencing.

¶ 59 Where a defendant alleges first prong plain error, the reviewing court must determine whether the defendant established that the evidence was so closely balanced that the error alone "severely threatened to tip the scales of justice." *People v. Sebby*, 2017 IL 119445, ¶ 51. In ascertaining whether the evidence was closely balanced, the reviewing court must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case. *Sebby*, 2017 IL 119445, ¶ 53.

¶ 60 Based on the record, we find that the evidence at sentencing was closely balanced, which necessitates reversal under the first prong of plain-error review. The circuit court cited three aggravating factors, including, in error, the pending charges against the defendant. The remaining aggravating factors cited by the circuit court were the defendant's history of criminality and/or delinquency and that the sentence was necessary to deter others from committing the same crime. While the circuit court did not find any factors in mitigation, the defendant had argued several mitigating factors. The following factors in mitigation were argued by the defendant: the defendant

18

struggled with mental health issues since childhood, which required numerous inpatient hospitalizations as a child; the defendant had issues with substance abuse, which started when he was 13 years old; during his incarceration the defendant completed the "Take Action Today's Recovery Education and Re-entry Support Program"; the defendant had been employed from 2004 through 2006; the defendant was under strong provocation from Martin before he was stabbed; and the defendant showed remorse and took responsibility for his actions.

¶ 61   Accordingly, we vacate the defendant's sentence and remand the matter for resentencing. We need not reach the defendant's argument regarding second prong plain error as the defendant's sentence is vacated based on first prong plain error.

¶ 62                                III. CONCLUSION

¶ 63   For the reasons stated above, we affirm the defendant's conviction, but we vacate his sentence and remand for resentencing. The defendant was provided with effective assistance of counsel. The circuit court lacked jurisdiction to hear the defendant's posttrial ineffective assistance of counsel claim. However, the defendant is entitled to be resentenced because the circuit court improperly considered charges pending against the defendant at the time he was sentenced and the evidence at sentencing was closely balanced.

¶ 64   Conviction affirmed; sentence vacated; remanded for resentencing.